**FILED**

MAY 2 9 2007

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

TIMOTHY W. WOODS,

      **Plaintiff,**

v.                            **Civil Action No. 1:06CV120**
                                       **(Chief Judge Keeley Irene M. Keeley)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Summary Judgment or, in the Alternative, for Remand and on Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. PROCEDURAL HISTORY

Timothy W. Woods ("Plaintiff") filed an application for DIB on December 31, 2003, alleging he became disabled on January 31, 2003, due to lumbar and cervical herniated and bulging

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

discs, muscle spasms, and pain and numbness in fingers on both hands (R. 75-78, 120).[2] Plaintiff's applications were denied at the initial and reconsideration levels (R. 37-54). Plaintiff requested a hearing, which Administrative Law Judge James P. Toschi ("ALJ") held on December 14, 2005 (R. 490-515). Plaintiff, represented by counsel, testified on his own behalf (493-508). Also testifying was Vocational Expert Nancy Shapero ("VE") (R. 508-14). On February 24, 2006, the ALJ entered a decision finding Plaintiff was not disabled and could perform a limited range of light work (R.18-30). Plaintiff timely filed a Request for Review with the Appeals Council (R. 14). On June 19, 2006, the Appeals Council notified Plaintiff it had denied his Request for Review, making the ALJ's decision the final decision of the Commissioner (R. 8-10).

## II. FACTS

Plaintiff was born on May 24, 1960, and was 45 years old at the time of the administrative hearing (R. 493). He has a high school education and past relevant work as a grocery store clerk (R. 106, 111-12, 126, 227-29, 495).

Plaintiff injured his back at work on August 29, 1981, and returned to work on November 15, 1981. He worked until October 26, 1982, when he sustained a second injury to his back. Plaintiff was hospitalized from June 20, 1983, to June 28, 1983, during which time he underwent a myelogram, which showed a herniated nucleus pulposus at L4-5. Plaintiff did not undergo surgery (R. 175). A CT scan, performed on December 7, 1983, revealed a herniated nucleus pulposus at L4-5. A lumbar laminectomy was recommended (R. 165). Plaintiff refused surgery (R. 176). Plaintiff

---

[2]On August 1, 2002, Plaintiff applied for DIB. That application was denied initially on January 24, 2003, and no request for reconsideration was filed (R. 18, 36, 70-74). Plaintiff's non-disability status as of that date is binding. 20 CFR §§ 404.900(b) and 404.905. Plaintiff must, therefore, demonstrate disability as of January 24, 2003.

was released to work on June 5, 1985 (R. 164).

On June 28, 1999, Plaintiff reinjured his back at work (R. 179).

On July 8, 1999, Plaintiff presented to Luis A. Loimil, M.D., for treatment of his back injury. Dr. Loimil diagnosed acute lumbosacral sprain/strain "superimposed on disc degenerative disease and arthrosis of the lumbosacral spine" and instructed Plaintiff to resume physical therapy (R. 383).

On October 15, 1999, Plaintiff presented to Summersville Outpatient Center/Family Practice with complaints of his blood pressure being elevated and was treated by Eve Johnson, M.S., PA-C. Plaintiff's blood pressure was 164/110. Plaintiff was prescribed Toprol (R. 433).

On December 15, 1999, Physician's Assistant Johnson noted Plaintiff's hypertension was controlled with Toprol and she continued his prescription (R. 431).

On December 21, 1999, Plaintiff had a MRI of his lumbar spine made. The impression was for intervertebral disc space narrowing at L5-S1 level with "vacuum phenomenon"; posterior osetophytes at the L5-S1 level; and "generalized bulging without herniation of the L4-L5 and L5-S1 intervertebral discs" (R. 177).

On January 28, 2000, Dr. Loimil cleared Plaintiff to return to work at light duty (R. 381).

Plaintiff presented to Dr. Loimil on March 24, 2000, with complaints of back pain. Dr. Loimil noted he would seek authorization for Plaintiff to be treated by a neurologist (R. 380).

On April 27, 2000, Constantino Y. Amores, M.D., a neurologist, examined Plaintiff for localized low back pain (R. 278). Dr. Amores opined Plaintiff had degenerative disk disease in his lower lumbar spine, without neurological deficit. Dr. Amores recommended conservative, non-surgical treatment (R. 279).

On May 11, 2000, Plaintiff returned to Physician's Assistant Johnson for treatment of

hypertension. He was prescribed Avapro and an echocardiogram was ordered (R. 430).

On May 19, 2000, Dr. Loimil noted he would seek authorization for Plaintiff to be treated by Francis Saldanha, M.D., for pain management (R. 379).

On June 12, 2000, Mohammed I. Ranavaya, M.D., completed an Independent Medical Evaluation of Plaintiff for Workers' Compensation (R. 179-86). Dr. Ranavaya opined Plaintiff required no further treatment, was not disabled, had reached his maximum medical degree of improvement, and could return to work "as soon as he [chose] to do so" (R. 185).

On September 8, 2000, Plaintiff "requested & was given a slip" from Dr. Loimil "to return to work on 9/11/2000" (R. 378).

On September 8, 2000, Dr. Saldanha examined Plaintiff at the request of Dr. Loimil. He diagnosed chronic lumbar strain with facet arthropathy (R. 224). He recommend a single injection to Plaintiff's facet joints for pain management and opined Plaintiff could return to work (R. 225).

On November 30, 2000, Paul K. Forberg, M.D., completed an Independent Medical Evaluation of Plaintiff for Workers' Compensation (R. 190-97). Dr. Forberg reviewed Plaintiff's medical records and tests and conducted an examination of Plaintiff (R. 190-93, 133-95, 198-201). Dr. Forberg's diagnoses were for herniated nucleus pulposus, left L4-5, healed and chronic, recurrent, and non-specific back pain (R. 195). Dr. Forberg found Plaintiff should "seek another job description that [did] not require heavy lifting, repetitive bending and stooping" (R. 196).

On January 30, 2001, Plaintiff reported to Physician's Assistant Johnson that he stopped taking Avapro two to three months ago because the prescription expired. Plaintiff reported feeling fine. Plaintiff's blood pressure was 160/90. Physician's Assistant Johnson noted Plaintiff's EKG was normal. She prescribed Protonix for Plaintiff's epigastric pain. She ordered Plaintiff to wear

4

a Holter monitor for twenty-four hours. Plaintiff said he would attempt to control his hypertension with diet and exercise (R. 428).

On February 8, 2002, Plaintiff presented to James Shumate, D.O., at the Summersville Outpatient Center/Family Practice for a follow-up examination. Plaintiff's chief complaints were for reflux and abdominal pain, which Protonix had "greatly helped." Plaintiff stated he was anxious and nervous, which caused his blood pressure to elevate. Plaintiff informed Dr. Shumate his low back pain had increased. Plaintiff's blood pressure was 160/94. Plaintiff was diagnosed with anxiety and gastroesophageal reflux disease. Plaintiff's diet was modified and he was prescribed Protonix for his acid reflux condition. Plaintiff was prescribed Paxil for his "nerves" (R. 426).

On March 9, 2002, Plaintiff had a x-ray of his lumbar spine. It showed "severe degenerative changes of L5-S1 with marked narrowing and vacuum phenomena, hypertrophic changes of L4, L5 and in the flexion/extension views there is no abnormal translation" (R. 389).

Also on March 9, 2002, Dr. Loimil examined Plaintiff. He noted Plaintiff could stand unassisted, did not have scoliosis, but had an antalgic lean, lumbar hypolordosis, and lumbar hyperlordosis. Plaintiff was positive for a limp on the left. He could fully squat (R. 387). Dr. Loimil diagnosed lumbosacral sprain/strain and arthrosis. He excused Plaintiff from work and ordered an MRI. Dr. Loimil prescribed Skelaxin and Vioxx (R. 388).

On April 13, 2002, Plaintiff had a MRI made of his lumbar spine. The impression was for mild degenerative changes at L4-5 and L5-S1 and no evidence of herniated nucleus pulposus (R. 222).

On April 17, 2002, Dr. Loimil noted Plaintiff's diagnosis was unchanged and his condition was unimproved. Dr. Loimil reported the April 13, 2002, MRI showed "mild degenerative changes

5

at L4-5 and L5-S1; no evidence of disc herniation." Plaintiff was prescribed Celebrex instead of Vioxx (R. 377).

On September 30, 2002 Dr. Bachwitt completed an Independent Medical Examination of Plaintiff for Workers' Compensation (R. 227-32). He reviewed medical opinions and tests relative to Plaintiff's condition (R. 227-30, 231). He opined Plaintiff had reached maximum medical improvement. Dr. Bachwitt found Plaintiff could work at the sedentary and light work levels (R. 230).

On October 11, 2002, Plaintiff presented to the Emergency Department of Summersville Memorial Hospital with complaints of "coughing up blood." A x-ray was made of his chest. It showed "fine interstitial change of lower lung fields and borderline cardiomegaly with elongation of ascending aorta, otherwise unremarkable" (R. 242, 248). Plaintiff was released to home (R. 243).

On October 17, 2002, a CT scan was completed of Plaintiff's chest, which showed interstitial fibrosis, COPD, and borderline nonspecific mediastinal lymphnodes, but no overt mediastinal mass or lymphadenopathy (R. 438).

On November 11, 2002, Plaintiff returned to Summersville Outpatient Center/Family Practice and was evaluated by Physician's Assistant Johnson. Plaintiff's blood pressure was 170/120. Physician's Assistant Johnson prescribed Avapro for hypertension and Lortab for back pain (R. 424).

On November 18, 2002, Physician's Assistant Johnson continued Plaintiff's prescription for Avapro and noted Plaintiff would have to receive prescriptions for Lortab for back pain from Dr. Loimil (R. 422).

On November 27, 2002, Plaintiff presented to Dr. Loimil for evaluation of his back. Dr.

Loimil noted Plaintiff had undergone a "FCE" and had been diagnosed with hypertension. He also instructed Plaintiff he "need[ed] . . . [a rehabilitation] evaluation to see if they have anything to offer from the rehabilitation standpoint" (R. 367).

On December 12, 2002, Physician's Assistant Johnson noted Plaintiff's blood pressure was 150/100. She prescribed Avapro and HCTZ and provided Plaintiff with a prescription for Lortab for his back pain. She informed him that she would not provide this medication to him in the future and that he would have to obtain it from Dr. Loimil (R. 421).

On December 13, 2002, Scott Spaulding, M.A., Licensed Psychologist, completed a Disability Determination Evaluation of Plaintiff for the West Virginia Disability Determination Service. Mr. Spaulding did not review any records for this evaluation; Plaintiff was the only source of information. Mr. Spaulding observed Plaintiff had a good attitude and was cooperative. Plaintiff had "no problems with gait and posture." He did not use any ambulatory aids and he drove to the evaluation (R. 249).

Plaintiff reported the following conditions to Mr. Spaulding: treatment for back pain, which began in the 1980's; "problems with nerves . . . and depression," which began in February, 2002; "significant anger" due to his employer; a stomach condition, which began in February, 2000; and high blood pressure, which was diagnosed in February, 2002. Plaintiff informed Mr. Spaulding his stomach "bother[ed] him frequently"; he had a "short fuse"; he had "decreased concentration and a little problem with memory"; he was "irritable and worrie[d] frequently"; he could not "control his worry"; he experienced a "loss of interest in activities and [was] frequently aggravated"; and he reported "guilty feelings because he [could not] provide for his family." Plaintiff stated he experienced sleep disturbances in that he slept for five hours per night. Plaintiff informed Mr.

Spaulding his weight fluctuated and he had little energy. Plaintiff denied nightmares, crying spells, obsessive-compulsive traits or phobias, or suicidal or homicidal ideations (R. 250).

Plaintiff reported "no significant mental health treatment." Plaintiff informed Mr. Spaulding he was treated at a hospital's emergency room in January, 2002, for nerves and anger. Plaintiff reported having last drunk alcohol one year earlier. Plaintiff stated he smoked one and one-half packages of cigarettes per day. Plaintiff reported no surgeries and physical therapy and work hardening programs for his back. Plaintiff informed Mr. Spaulding his medications were Avapro, Protonix, Skelaxin, and Celebrex (R. 251).

Plaintiff reported his activities of daily living included the following: rising at 5:00 a.m.; watching television; showering and dressing; eating breakfast in a restaurant; driving his daughters to school; watching television for three to four hours; using the computer for two hours; talking to his wife frequently during the day; and exercising thirty minutes per day. Plaintiff stated he played guitar four or five times per week (R. 251). Plaintiff reported the following social functioning activities: he had "no problems shopping in stores"; he was not angry with strangers; he went out to watch his wife sing two times per month; he ate out several times per week; he went to the movies once every two months; he visited neighbors two or three times per week; and he visited family members two to three times per week (R. 252).

Mr. Spaulding found Plaintiff's speech relevant and coherent. Plaintiff was oriented as to time, person, and place. Plaintiff's observed affect was constricted. His observed mood was solemn. His stream of thought was logical, sequential, and coherent. Plaintiff's thought content revealed no hallucinations, delusional thinking, obsessive-compulsive traits, or phobias. Plaintiff's psychomotor activity, judgment, and insight were normal. Plaintiff's immediate memory was normal; his delayed

8

memory was mildly deficient; his remote memory was normal. Plaintiff's attention and concentration were normal. His social functioning was normal. Mr. Spaulding found Plaintiff's persistence and pace were normal (R. 252).

Mr. Spaulding diagnosed the following: Axis I – general anxiety disorder and mood disorder, not otherwise specified; Axis II – none; Axis III – back pain by self report (R. 252).

On January 10, 2003, Dr. Loimil noted Plaintiff's December 13, 2002, FCE showed he could work in the light physical demand level. The FCE showed Plaintiff would benefit from active physical rehabilitation, such as physical therapy, to improve his strength, range of motion, and endurance. Dr. Loimil agreed with the assessment (R. 375).

On January 16, 2003, Debra L. Lilly, Ph.D., a state-agency psychiatrist, completed a Psychiatric Review Technique of Plaintiff. She found Plaintiff had affective disorders and anxiety-related disorders, impairments which were not severe (R. 252). Dr. Lilly found Plaintiff had mild limitations in his activities of daily living, mild limitations in his ability to maintain social functioning, and mild limitations in his ability to maintain concentration, persistence, or pace. Dr. Lilly found Plaintiff had not experienced any episode of decompensation (R. 264).

On February 21, 2003, Dr. Loimil opined Plaintiff could return to work at light duty (R. 375).

On April 4, 2003, Plaintiff was released to light duty work by Dr. Loimil (R. 374).

On June 4, 2003, Plaintiff informed Dr. Loimil he did not return to work. He stated "his claims manager ha[d] changed his rehab worker." Plaintiff requested Dr. Loimil prescribe Lortab to him and stated "that his claims manager said that it was okay." Dr. Loimil noted "it [was] not okay with us as [he did] not prescribe[] that type of medication for this condition." Dr. Loimil prescribed Flextra to Plaintiff for pain and instructed him to return in three months (R. 374).

On July 31, 2003, Plaintiff presented to the Emergency Department of the Summersville Memorial Hospital with complaints neck and back pain as a result of his having been in a motor vehicle accident (R. 268). A chest x-ray was made, which was compared to x-rays taken in October, 2002. There was no evidence for acute infiltrate with mild prominence to bronchovascular markings (R. 272). A x-ray was made of Plaintiff' lumbar spine, which showed prominent degenerative disc disease at L5-S1, facet arthrosis, hypertrophy with spurring, and arthritic degenerative change (R. 373). Plaintiff's thoracic spine, as seen on a x-ray, showed no evidence for definite compression but was positive for some spondylosis (R. 270). Plaintiff was diagnosed with a sprain and strain and released to home as stable (R. 269).

On August 8, 2003, Plaintiff reported to Summersville Outpatient Center/Family Practice as follow-up to his visit to the Emergency Department of the Summersville Memorial Hospital for his involvement in a MVA. He was examined by Dr. Shumate. Plaintiff complained of increased neck and upper back pain. Dr. Shumate noted Plaintiff's blood pressure was 146/108 and his weight was 203 pounds. Plaintiff had spasm in the trapezius area, especially on the left. His cervical flexion was decreased to about sixty degrees and extension was reduced to twenty degrees. Dr. Shumate opined the accident did "not appear to have worsened his degenerative disc disease of his lumbar spine." Dr. Shumate assessed neck and thoracic pain and hypertension. Dr. Shumate instructed Plaintiff to continue Lodine, Flexeril and Lortab and ordered a neck and thoracic MRI (R. 419).

On August 13, 2003, a MRI of Plaintiff's cervical spine showed disc herniation at C5-6. A MRI of Plaintiff's thoracic spine showed "left sided bony hypertrophy as well as perhaps minimal disc bulges at T8-9 and T9-10" (R. 277, 435).

On August 15, 2003, Plaintiff returned to Summersville Outpatient Center/Family Practice.

10

Physician's Assistant Johnson noted Plaintiff's MRI showed a possible minimal thoracic disk bulge and a herniated disk at C5-6. The results of Plaintiff's MRI were faxed to Dr. Loimil. Physician's Assistant Johnson prescribed Lortab and Flexeril to Plaintiff (R. 418).

On August 18, 2003, Plaintiff began physical therapy at Summersville Memorial Hospital Sports Medicine Center (R. 301-22). Plaintiff received physical therapy five times during August, 2003 (R. 316).

On August 20, 2003, Plaintiff presented to Dr. Loimil with complaints of increased soreness in his lower back due to his having been involved in a motor vehicle accident. Dr. Loimil noted the accident "mainly affected the cervical and thoracic spine" and that Plaintiff should be seen by a neurologist. Plaintiff was not released to work due to the accident (R. 373).

On September 2, 4, 5, 9, 10, 13, 18, 23, 26, and 29, 2003, Plaintiff received physical therapy at Summersville Memorial Hospital Sports Medicine Center (R.311-15).

On September 3, 2003, Plaintiff presented to Physician's Assistant Johnson to request medication for neck pain. Plaintiff informed Physician's Assistant Johnson that Dr. Loimil was not treating him for his neck pain and had referred him to a neurosurgeon. Plaintiff stated physical therapy had "been helpful." Physician's Assistant Johnson informed Plaintiff she would not treat him for pain management and she noted she could not prescribe additional Lortab because she would exceed the monthly limit. She noted she had forwarded Plaintiff's information to a pain clinic and Neurologic Associates and there was nothing further she could do. Physician's Assistant Johnson noted she felt any neurologist would treat Plaintiff conservatively (R. 416).

On September 3, 2003, Plaintiff phoned Dr. Loimil and requested prescriptions for Lortab and Flexeril. Dr. Loimil refused to provide those prescriptions and instructed Plaintiff to contact his

11

family physician "as he is the one who prescribed these" (R. 373).

On September 11, 2003, Dr. Amores, a neurosurgeon, informed Dr. Loimil that his consultative examination of Plaintiff revealed displacement of cervical disk without myelopathy. He reviewed Plaintiff's August 13, 2003, MRI. Dr. Amores opined Plaintiff should be treated conservatively and non-surgically (R. 275).

On September 15, 2003, Wesley Olson, M.D., of the Summersville Outpatient Center/Family Practice, evaluated Plaintiff when he appeared requesting pain medication. Plaintiff stated his pain was chronic and an eight on a scale of one to ten. Plaintiff informed Dr. Olson that physical therapy did not alleviate his pain. Dr. Olson noted Plaintiff's neck was minimally tender and had no significant paraspinous spasm. His upper extremities showed good muscle strength bilaterally and his reflexes were normal. Plaintiff's deltoids showed good strength, his grips were equal bilaterally, and he had no interosseous atrophy. Dr. Olson diagnosed musculoskeletal neck strain. He prescribed Lortab "to last until he sees the [Pain] Clinic on 9/24." Dr. Olson told Plaintiff "that would be all [the Lortab] [he] would give him" (R. 415).

On September 24, 2003, Plaintiff had his initial visit at the Know Pain Clinic and was examined by Henriot St. Gerard, M.D. Plaintiff's chief complaint was for neck and low back pain. Plaintiff denied numbness and stated his pain was at six to seven, seven being the worse in the past thirty days. Plaintiff informed Dr. Gerard he had been involved in a motor vehicle accident on July 31, 2003 (R. 336).

Plaintiff reported his exercise was in the form of physical therapy three days per week. He slept six to seven hours per night. He had a good appetite. Plaintiff reported a significant history of arthritis and anxiety. Plaintiff informed Dr. Gerard he had experienced stress due to financial

12

difficulties. Plaintiff stated he smoked one and one-half packages of cigarettes per day and did not use alcohol or drugs. Plaintiff listed his drugs as Lortab and Flexeril (R. 337).

Dr. Gerard found Plaintiff's Spurling's test was negative (R. 337). Plaintiff's straight leg raise was negative to ninety degrees. His Patrick's test was negative, bilaterally. Dr. Gerard assessed herniated nucleus pulposus at C5/6 and lumbosacral strain. Dr. Gerard prescribed Lortab and Flexeril. He informed Plaintiff that treatment with epidural injections would begin at his next visit. Dr. Gerard found no consultative evaluations with other physicians were necessary. As to Plaintiff's depression and anxiety, Dr. Gerard found Plaintiff was "doing okay" at that time. Dr. Gerard recommended Plaintiff continue with physical therapy (R. 338).

On October 2, 8, 10, 14, 16, 21, 28, 30, and 31, 2003, Plaintiff received physical therapy at Summersville Memorial Hospital Sports Medicine Center (R. 308-10, 312).

On October 22, 2003, Shishir Shah, M.S., M.D., of the Know Pain Clinic, examined Plaintiff. Plaintiff stated physical therapy "help[ed] a lot." Plaintiff stated his pain had reduced to "3 and 4 out of 10 as an aching in the neck without any radiation." Plaintiff informed Dr. Shah he slept seven hours per night, had a fair appetite, and smoked one and one-half packages of cigarettes per day. Plaintiff listed his medication as Flexeril and Lortab (R. 334).

Dr. Shah's examination found Plaintiff's neck was supple (R. 334). Dr. Shah noted Plaintiff exhibited tenderness at C5 and T1 base of the paraspinous musculature midline. Plaintiff's strength was 5/5 bilaterally. Plaintiff's cervical spine range of motion was 45 degrees on the right and forty degrees on the left. Plaintiff's flexion and extension were full. He had negative subluxation, compression distraction, Lhermitte's, and Spurling's. Dr. Shah continued Plaintiff's medications, noted he would consider epidural injections at the next visit, and recommended continuation of

13

physical therapy (R. 335).

On October 29, 2003, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The following findings were made: Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday, and unlimited push and pull (R. 282). Plaintiff was occasionally limited in climbing ramps, stairs, ladders, ropes, and scaffolds; balancing; stooping; kneeling; crouching; and crawling (R. 283). Plaintiff's RFC was reduced to light (R. 286).

On November 4, 5, 7, 13, and 20, 2003, Plaintiff received physical therapy at Summersville Memorial Hospital Sports Medicine Center (R. 307).

On November 14, 2003, Plaintiff was evaluated by Dr. Loimil, who noted no significant change in his condition (R. 372).

On December 4, 17, 22, and 26, 2003, Plaintiff received physical therapy at Summersville Memorial Hospital Sports Medicine Center (R.303-06).

On December 8, 2003, Plaintiff presented to Dr. Shah, of the Know Pain Clinic. Plaintiff stated his pain was four on a scale of one to ten; he had no numbness, tingling, burning, or swelling; and his pain was alleviated by physical therapy. Plaintiff informed Dr. Shah he walked for exercise, slept five to six hours per night, had a good appetite, and smoked one and one-half packages of cigarettes per day. Plaintiff stated he medicated with Lortab and Flexeril (R. 332).

Dr. Shah's examination revealed Plaintiff's neck was supple, and he had tenderness in the paracervical musculature with trigger point noted in the right superior border of the trapezius muscle. Plaintiff stated he experienced intermittent radicular symptoms into his right arm. Dr. Shah assessed

14

a herniated nucleus pulposus at C5/6 (R. 332). He continued Plaintiff's medications and deferred consideration of injectable therapy. Dr. Shah opined no neurosurgical or psychological consults were warranted. Plaintiff was encouraged to continue physical therapy and home exercises (R. 333).

On December 15, 2003, Plaintiff presented to Summersville Outpatient Center/Family Practice to obtain "an excuse for being off work over the past three months." Physician's Assistant Johnson noted Plaintiff had only been to the pain clinic on September 15, 2003, and this date. Physician's Assistant Johnson noted the physical therapist (Mike Elliott) had opined Plaintiff had not had any "significant problems during that period of time"; had "greatly improved" range of motion; and could be discharged from physical therapy. Plaintiff's blood pressure was 172/70. Physician's Assistant Johnson instructed Plaintiff to continue with pain management at the pain clinic. Physician's Assistant Johnson denied Plaintiff's request for a work excuse for the time frame he requested; she did, however, extend his excuse from August 22, 2003, to September 15, 2003, the time of Plaintiff's last visit with her (R. 406, 413).

On January 14, 2004, Joseph E. Fernandes, M.D., completed an orthopedic evaluation of Plaintiff. Plaintiff informed Dr. Fernandes he had stopped smoking tens days ago and did not consume alcoholic beverages. Plaintiff denied hypertension, diabetes, or cardiac conditions. Plaintiff stated he had injured his back on June 26, 1982, and November 8, 1991, at work (R. 290). Plaintiff stated his low back pain was present all the time. He described his pain as a muscle spasm. Plaintiff denied radiation of pain to his legs, but asserted he occasionally experienced tingling and numbness in both thighs, which lasted for a few minutes. Plaintiff listed the following functional activities: completed of some household chores as his wife was pregnant; mowed the lawn during the summer; and deer hunted for two days during the past hunting season (R. 291).

15

Dr. Fernandes reviewed medical records and tests in completing his evaluation of Plaintiff (R. 291-94). Dr. Fernandes' examination of Plaintiff revealed he ambulated without any limp (R. 294). Dr. Fernandes found the following impressions: status post lumbosacral strain; degenerative disc disease L4-L5 and L5-S1; chronic low back pain syndrome; history of whiplash injury as consequence of MVA (R. 295). Dr. Fernandes found Plaintiff had reached maximum medical improvement relative to his work-related injury on June 28, 1999. Dr. Fernandes found Plaintiff could return to work at light duty (R. 296).

On January 16, 2004, Plaintiff reported to Physician's Assistant Johnson, at Summersville Outpatient Center/Family Practice, that he had stopped taking his blood pressure medicine. His blood pressure was 160/100. Physician's Assistant Johnson prescribed Avapro and instructed Plaintiff to reduce his weight and diet. Plaintiff stated he stopped smoking on January 1, 2004. Plaintiff stated he felt "great" and that he did not have "any problems" (R. 405).

On January 21, 2004, Plaintiff was discharged from physical therapy at Summersville Memorial Hospital Sports Medicine Center due to "poor compliance/motivation" . . . "secondary to patient not returning to clinic" (R. 301).

On January 30, 2004, Plaintiff returned to Dr. Loimil for an evaluation of his back. Dr. Loimil found Plaintiff "need[ed] to undergo a repeat FCE to determine his limitations and/or capabilities as [he did] not evaluate patients from this standpoint . . . ." Plaintiff informed Dr. Loimil that the store at which he work had closed (R. 372).

On February 9, 2004, Plaintiff presented to Dr. Shah, of the Know Pain Clinic, with complaints of numbness in his fingers and burning in his neck. Plaintiff stated his pain was at level two to three on a scale of ten with medication. Plaintiff stated standing, sitting and cold exacerbated

16

his pain and that heat alleviated his pain. Plaintiff informed Dr. Shah that he had not attended physical therapy as he had "been very busy" and been "told by the clinic not to go." Dr. Shah noted there was no record of anyone at the clinic instructing Plaintiff to not participate in physical therapy and conjectured that Plaintiff was busy caring for his pregnant wife. Plaintiff stated he walked for exercise, slept six to seven hours per night, had a good appetite, and denied alcohol or tobacco use. Plaintiff listed his medication as Lortab and Flexeril (R. 330).

Dr. Shah's examination revealed Plaintiff was alert and oriented times three. He was in no acute distress. His neck was supple. Plaintiff had tenderness in the paracervical musculature bilaterally without trigger points. Plaintiff did report paresthesias in both hands. Plaintiff's grip strength was slightly decreased on the right. Plaintiff's compression, distraction and Spurling's tests were negative. He had no radicular symptoms (R. 330). Dr. Shah diagnosed herniated nucleus pulposus at C5/6 with subjective cervical radiculopathy. Dr. Shah continued Plaintiff's medications, determined no neurosurgical or psychological consults were warranted, and encouraged Plaintiff to return to physical therapy. Plaintiff did not accept Dr. Shah's recommendation that he undergo injectable therapies (R. 331).

On February 18, 2004, Physician's Assistant Johnson prescribed Lotrel and Cozaar for treatment of hypertension. She ordered an upper GI (R. 403, 409).

On February 24, 2004, Plaintiff had an upper GI, which was normal (R. 434, 436).

On February 25, 2004, Physician's Assistant Johnson noted Plaintiff's blood pressure was 140/92. She prescribed Lotrel, Cozaar and Zocor and instructed Plaintiff to return for evaluation in one week (R. 404, 408).

On February 25, 2004, Arthur Smith, Jr., a physical therapist with Gauley River Physical

Therapy & Rehabilitation, LLC, completed a Functional Capacity Evaluation Report of Plaintiff. Mr. Smith found Plaintiff's pain was moderate during testing (R. 323). Mr. Smith found Plaintiff could frequently leg lift twenty pounds; occasionally twelve-inch lift thirty pounds; occasionally shoulder lift ten pounds; frequently shoulder lift five pounds; occasionally carry fifteen pounds for thirty feet; frequently carry eight pounds for thirty feet; occasionally push twenty pounds for thirty feet; and occasionally pull twenty-five pounds for thirty feet. Mr. Smith found Plaintiff could occasionally sit, stand, squat, crawl, climb stairs, and use leg controls. Mr. Smith found Plaintiff could minimally bend and constantly stand and walk. Mr. Smith found Plaintiff could frequently walk, reach, and use arm controls. Mr. Smith opined Plaintiff could work at the sedentary light level (R. 321).

Mr. Smith recognized two courses of action as "feasible" regarding Plaintiff's returning to work. First, Plaintiff could return to his cashier job part time and increase to full time over a three-to-four week period or he could enter into a work conditioning program and progress to a work hardening program that would rehabilitate him for his job. Second, if an alternative work position was the goal, a determination should be made if Plaintiff could immediately begin work or should enroll in industrial rehabilitation for the job (R. 325).

On March 5, 2004, Plaintiff presented to Narciso Rodriquez-Cayro, M.D., of the Know Pain Clinic, with complaints of constant stabbing, aching type pain in his neck. Plaintiff stated the pain did not radiate and he did not have numbness, burning, tingling, or swelling. Plaintiff informed Dr. Rodriquez-Cayro that his pain was rated at a four on a scale of one to ten with medication. Plaintiff stated he was able to "function[] and . . . do things around the house like tak[e] out the trash" when he took his medication. Plaintiff informed Dr. Rodriquez-Cayro that he walked for exercise, slept

for six to seven hours per night, had a good appetite, and did not use alcohol or tobacco. Plaintiff listed his medications as Lortab and Flexeril. Dr. Rodriquez-Cayro found Plaintiff's neck was supple. He noted Plaintiff had mild paracervical tenderness but good range of motion (R. 328). Dr. Rodriquez-Cayro assessed herniated nucleus pulposus at C5/6. He continued Plaintiff's medication and did not refer Plaintiff for neurosurgical, psychiatric, or new physical therapy consultations. Plaintiff stated he would consider a future cervical epidural injection and he would continue to be as "active as possible with walking, range of motion exercises, and stretching" (R. 329).

On April 2, 2004, Plaintiff returned to Dr. Loimil to discuss his back condition. Dr. Loimil noted Plaintiff's FCE showed he could work at the sedentary level (R. 372).

On April 2, 2004, Dr. Shah, of the Know Pain Clinic, examined Plaintiff. Plaintiff informed Dr. Shah that his pain in his neck and lower back was "2 out of 10 with medicine and [was] presently a 4, and 5 has been the worst in the last 30 days." Plaintiff complained of numbness and tingling in his fingers and toes. Plaintiff stated heat helped alleviate his pain. Plaintiff stated he walked for exercise; slept six hours per night; had a good appetite; and did not use alcohol or tobacco. Plaintiff listed his medication as Lortab and Flexeril (R 326).

Dr. Shah found mild tenderness in Plaintiff's paracervical musculature bilaterally with spasm. Plaintiff's grips were equal at 5/5 bilaterally. Plaintiff's left and right rotation did not exacerbate the pain, but flexion and extension did increase the pain (R. 326).

Dr. Shah assessed Plaintiff with herniated nucleus pulposus at C5/6. He prescribed Lortab and Flexeril. Plaintiff deferred injectable therapy because he was "severely afraid of the injections." Dr. Shah opined no neurosurgical or psychological consultations were warranted. Dr. Shah encouraged Plaintiff to "be as active as tolerable" (R. 327).

On May 24, 2004, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The state agency physician found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 341). Plaintiff could occasionally climb ladders and scaffolds, balance, stoop, kneel, crouch, and crawl. Plaintiff could never climb ropes (R. 342). The state agency physician found Plaintiff was limited in his ability to reach in all directions, including overhead, but had no limitations in handling, fingering, or feeling (R. 343). The state agency physician found Plaintiff had no visual or communication limitations (R. 343-44). The state agency physician found Plaintiff's exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited. Plaintiff had to avoid concentrated exposure to extreme cold and should avoid even moderate exposure to extreme heat, hazards, and vibration (R. 344).

On June 24, 2004, Joseph A. Snead, M.D., completed an impairment evaluation of Plaintiff. Plaintiff reported he had injured his back at work in June, 1999, and had injured his neck and thoracic spine in a motor vehicle accident six months ago. This accident did not injure his lumbar spine. Plaintiff stated he was in constant pain, which he treated with Lortab and Flexeril (R. 348).

Dr. Snead reviewed Plaintiff's medical records and tests (R. 349-50). Upon examination, Dr. Snead noted Plaintiff appeared "to be in some distress." He walked without a limp and could squat with difficulty (R. 350). Dr. Snead found Plaintiff "did demonstrate . . . definite tenderness in the L4-5 area but no muscle spasm was present." Dr. Snead found no motor weakness or numbness in Plaintiff's legs. Plaintiff had full knee extension and his supine straight leg raising test was positive on the left at 25 degrees and on the right at forty degrees. Plaintiff's spinal range of

20

motion was 34 degrees of lumbar flexion and zero degrees of extension. Dr. Snead's review of Plaintiff's MRI showed "a bulging 4-5 disc, which touch[ed] the thecal sac on some transverse cuts but . . . no gross herniation." Dr. Snead diagnosed degenerative arthritis of the lumbar spine at the L4-5 level with a bulging disc without evidence of nerve root compression. Dr. Snead opined Plaintiff had reached maximum medical improvement and was unable to return to work that required bending over, lifting more than 20 to 25 pounds, or prolonged standing. Dr. Snead further opined Plaintiff "need[ed] to go to school and be retrained as per Vocational Rehabilitation" (R. 351).

On July 2, 2004, Dr. Loimil noted Dr. Snead's IME of Plaintiff showed he could work at light duty. Dr. Loimil instructed Plaintiff to increase his activities and return in three weeks to discuss being released to work at light duty (R. 371).

On August 20, 2004, Dr. Loimil released Plaintiff to work at light duty beginning on August 30, 2004. Dr. Loimil prescribed Flextra for pain (R. 371).

On October 6, 2004, Gomez A. Rafael, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Rafael found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 362). Dr. Rafael found Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 363). Dr. Rafael found Plaintiff was limited in his reaching in all directions, including overhead, but had no limitations in his ability to handle, finger, and feel (R. 364). Plaintiff had no communicative limitations. Dr. Rafael found Plaintiff's exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation was unlimited. He found Plaintiff should avoid concentrated exposure to hazards

(R. 365). Dr. Rafael reduced Plaintiff's RFC to light (R. 366).

On October 15, 2004, Plaintiff informed Dr. Loimil that he was still working but experienced severe low back pain. Dr. Loimil encouraged him to continue to work (R. 370).

On October 27, 2004, Plaintiff telephoned Dr. Loimil's office and stated he had "been unable to work since 10/15/04 due to low back pain . . . ." Dr. Loimil mailed a "slip . . . to [Plaintiff] . . . stating this" (R. 370).

On December 24, 2004, Plaintiff presented to the Emergency Department of the Summersville Memorial Hospital with complaints of back pain (R. 393). Plaintiff was prescribed Ultram and Skelaxin. Plaintiff was released to home in stable condition (R. 398).

On December 29, 2004, Plaintiff presented to Summersville Outpatient Center with complaints of low back and neck pain and was treated by Physician's Assistant Johnson. Plaintiff stated he was not exercising or using heat or ice to treat his back and neck pain. Plaintiff informed Physician's Assistant Johnson that he had not taken the medication prescribed at the pain clinic, so the doctor there "cut him off" his prescriptions. Plaintiff stated his hypertension was controlled with Cozaar and Lotrel. Physician's Assistant Johnson found Plaintiff's neck range of motion was good. She noted tender palpation along the cervical spine. Plaintiff could heel and toe walk (R. 399). Physician's Assistant Johnson instructed Plaintiff that he "need[ed] to help himself a little bit. He need[ed] to get up and start moving around and not just sit around doing nothing." Physician's Assistant Johnson informed Plaintiff that his muscular pain was stiffness, caused by not moving. Physician's Assistant Johnson instructed Plaintiff to treat his neck and back pain with range of motion exercises, heat, ice, and stretching. She informed him she was "not going to continue with pain management" and that he could seek the care at another pain clinic. She prescribed Lortab (R.

22

400).

On February 4, 2005, Tony R. Goudy, Ph.D., a psychologist, completed a Psychological Evaluation of Plaintiff at the "behest of his attorney . . . ." Plaintiff stated he had "been suffering from chronic pain, depression, and anxiety." Plaintiff stated his depression manifested itself in anhedonia, weight fluctuation, disturbed sleep, poor energy, feelings of guilt and worthlessness, poor concentration, and crying spells (R. 447). Plaintiff stated his anxiety symptoms included chronic motor tension, tension headaches, muscle jerks, muscle spasms, autonomic hyperactivity, apprehensive expectations, and feelings of discomfort with being in public. Plaintiff informed Dr. Goudy that he had "suffered from anxiety and depression for years, but his symptoms have significantly interfered with his daily functioning since 2002." Plaintiff state he had not engaged in individual psychotherapy or been psychiatrically hospitalized, but had taken Paxil in 2002 as prescribed by his family physician. Plaintiff informed Dr. Goudy he discontinued the medication because "he felt . . . it did not help alleviate his symptoms" (R. 448).

Plaintiff reported he was not abused as a child and he had no history of special education classes in school. Plaintiff informed Dr. Goudy he worked as a clerk in a supermarket for twenty-five years until he developed back pain (R. 448). Plaintiff denied alcohol use. He stated he had never been arrested. He reported he and his wife had declared bankruptcy. Plaintiff reported to Dr. Goudy that his sister was medicated for anxiety and depression and his mother had "a history of bad nerves and ha[d] taken Valium in the past" (R. 449).

Upon evaluation, Dr. Goudy observed Plaintiff's affect to be restricted; Plaintiff labeled his mood as reserved. Plaintiff's speech was relevant, spontaneous, and coherent (R. 449). Plaintiff was well oriented as to time, place, person, and circumstance. His immediate and remote memories

23

were intact. Dr. Goudy opined Plaintiff had mild impairment to his recent memory. Dr. Goudy found Plaintiff's concentration was markedly impaired. Plaintiff was found to function in the average intellectual range. Plaintiff's judgment was intact (R. 450).

Dr. Goudy opined Plaintiff's score of 35 on the Beck Depression Inventory II "reflect[ed] severe depressive symptomology." Plaintiff's score of 24 on the Beck Anxiety Inventory "reflect[ed] moderate levels of anxiety." Dr. Goudy opined Plaintiff's "most severe symptom . . . include[d] numbness or tingling, a general inability to relax, fear of the worst happening, heart racing, general nervousness, and chronic indigestion" (R. 450).

Dr. Goudy made the following diagnostic impressions: Axis I – depressive disorder, not otherwise specified, and generalized anxiety disorder; Axis IV – "financial problems, unemployment"; Axis V – current GAF 55-60 (R. 451). Dr. Goudy found, due to the combination of Plaintiff's affective and anxiety-related disorders, Plaintiff experienced mild impairment to his activities of daily living; mild to moderate impairment to social functioning; marked impairment to his concentration, persistence, and pace; and no episodes of decompensation. Dr. Goudy opined Plaintiff did not meet a Listing and would benefit from psychotherapy, specifically stress and pain management (R. 452).

On March 18, 2005, Dr. Goudy completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) of Plaintiff. He found the following as to Plaintiff's abilities to understand, remember and carry out instructions: remember locations and work-like procedures, understand and remember short, simple instructions, and make simple work-related decisions were good; carry out short, simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, and sustain an ordinary routine without special supervision were fair;

24

and understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and work with or near others without being distracted by them were poor (R. 453). Dr. Goudy found the following as to Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures: ask simple questions or request assistance and adhere to basic standards of neatness and cleanliness were excellent; accept instructions and respond appropriately to criticism from supervisors, get along with co-workers and peers, maintain socially appropriate behavior, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others were good; and interact appropriately with the public, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions were fair (R. 454).

On March 30, 2005, Plaintiff presented to Physician's Assistant Johnson at Summersville Outpatient Center/Family Practice with complaints of neck and low back pain and "problems with anxiety and some depression." Plaintiff informed Physician's Assistant Johnson that he was no longer "able to go to the pain clinic because he had another injury." Plaintiff stated Dr. Loimil had treated him with anti-inflammatory medications, which have been recalled, such as Vioxx. Plaintiff requested a prescription for Lortab and Flexeril. He informed Physician's Assistant Johnson that his wife had been prescribed Xanax by Dr. Olson and he had taken some of her prescription and "had immediate relief so now he want[ed] to be put on [Xanax] as well" (R. 473).

Physician's Assistant Johnson reviewed Plaintiff's MRI, which showed disc herniation at C5/C6 and minimal disc herniation at C5 and C6, T8/T9 and T9/T10. Physician's Assistant Johnson opined that she "really [did not] understand or recognize any findings on [that] . . . MRI that would indicate him [sic] needing to have chronic pain medication." Physician's Assistant Johnson

informed Plaintiff she did not "do back pain management"; however, she prescribed Lortab and Flexeril. Physician's Assistant Johnson discussed her prescribing a selective serotonin reuptake inhibitor or a serotonin norepinephrine reuptake inhibitor to treat Plaintiff's reported depression symptoms, but Plaintiff "prefer[red] to be on the Xanax." Physician's Assistant Johnson prescribed Xanax to Plaintiff (R. 473).

On April 12, 2005, Plaintiff was examined by Dr. Olson at Summersville Memorial Hospital/Family Practice. Dr. Olson noted Plaintiff was a "complicated patient who had been seeing other providers" and who felt like nothing was "being done . . . to resolve" his neck and back pain, inability to sleep, loss of appetite, crying, general depression, and feelings of anxiety and nervousness. Plaintiff requested a prescription for Xanax. He informed Dr. Olson he had "tried some of his wife's" medication and it had "help[ed] him immeasurably." Dr. Olson provided Plaintiff with a prescription for Xanax "for a while only as long as he [kept] appointments with counseling/Seneca which he agree[d] to do" (R. 472).

On June 7, 2005, Plaintiff underwent a Psychological Screening by Psychologist at Seneca Health Services, Inc. William D. Hagerty, M.A., a licensed psychologist, completed a mental status review and clinical review of Plaintiff. He also reviewed Plaintiff's clinical records. Plaintiff informed Mr. Hagerty he was seeking disability for neck and back injuries and that his medication included Cozaar and Lotrel. Plaintiff stated he had taken Xanex for depression, "but was referred [to Seneca Health Services] by his doctor if he wanted to continue on this medication" (R. 460, 479).

Mr. Hagerty observed Plaintiff to be fully oriented. He found no symptoms of thought disturbances. Plaintiff reported he slept six hours per night and that his sleep was periodically disrupted by "what may be panic attacks." Plaintiff stated his appetite was "okay." Plaintiff denied

thoughts of harming himself or others. Plaintiff stated he had felt depressed "on and off over the past year" due to "pain and financial worries." Mr. Hagerty diagnosed major depressive disorder, moderate, recurrent, and a GAF of 45. Mr. Hagerty recommended Plaintiff undergo therapy and psychiatric services to "address his symptoms" (R. 460, 479).

On June 8, 2005, a Multiaxil Assessment was completed of Plaintiff at Seneca Health Services. The diagnosis by Cathy Edwards, his case manager, was for major depression, recurrent, moderate, and a GAF of 45 (R. 457, 476).

On June 15, 2005, Plaintiff presented to Dr. Olson at Summersville Outpatient Center/Family Practice with complaints of back pain, chronic anxiety, and depression. Dr. Olson noted Plaintiff had been "terminated at the pain clinic because he shared his pills with his wife who didn't have enough and he failed his drug test." Plaintiff requested a prescription for Lortab, but Dr. Olson refused to prescribe that medication. Upon examination, Dr. Olson found Plaintiff's neck range of motion was limited. He had marked tenderness over the base of his cervical spine. Plaintiff had no upper extremity weakness, no diminution in strength, and no interosseous atrophy. His reflexes were equal bilaterally. Plaintiff's back examination revealed his spine was straight, some mild paraspinous tenderness, and equal reflexes in his lower extremities. Dr. Olson diagnosed chronic lumbosacral pain and prescribed Tylenol 3, Xanax, and Robaxin. Dr. Olson noted he would attempt to get Plaintiff accepted into the West Virginia University Pain Clinic for pain management and the Seneca Health Services for "evaluation and followup of depression and anxiety" (R. 471).

On June 17, 2005, Plaintiff was prescribed Paxil at Seneca Health Services, Inc. (R. 481).

On July 21, 2005, Plaintiff was prescribed Paxil and Tarazapan at Seneca Health Services, Inc. (R. 481).

27

On August 11, 2005, Plaintiff reported to the Emergency Department of Summersville Memorial Hospital complaining of back pain (R. 463). Plaintiff was treated with Toradol and Solunedrol (R. 469). He was provided prescriptions for Ultracet, Lodine, and Skelaxin, and released to home in good condition (R. 465-66, 468).

On August 16, 2005, a Multiaxil Assessment of Plaintiff was completed by Cathy Edwards, his case manager at Seneca Health Services, Inc. She diagnosed Plaintiff with major depression, recurrent, moderate, and anxiety disorder, "NOS." She found his GAF was 55 (R. 475).

On August 26, 2005, Plaintiff reported to Summersville Outpatient Center/Family Practice for a follow-up examination of his neck and back. Plaintiff reported to Dr. Olson that Tylenol 3 did not alleviate his pain and he requested Tylenol 4. Plaintiff informed Dr. Olson he occasionally took an "extra Xanax to rest" and Dr. Urick had prescribed Restoril. Dr. Olson found Plaintiff's physical condition was unchanged. Dr. Olson prescribed Tylenol 4 and Xanax. He instructed Plaintiff to return in two months and to follow up with Dr. Urick (R. 470).

On October 10, 2005, Plaintiff reported to Dr. Olson that he experienced chronic back pain. Dr. Olson noted Plaintiff's medications included Tylenol 4 and Xanax. Restoril was prescribed by Dr. Urick. Dr. Olson noted Plaintiff's physical condition was unchanged. Dr. Olson continued Plaintiff's prescriptions for Tylenol 4 and Xanax and instructed Plaintiff to return in two months (R. 474).

On October 17, 2005, Plaintiff was prescribed Paxil and Tarazapan at Seneca Health Services, Inc. (R. 481).

On December 2, 2005, Dr. Goudy completed a Psychological Evaluation Update of Plaintiff at the request of Plaintiff's attorney. Dr. Goudy opined Plaintiff's depression symptoms were

28

"similar to the ones noted in February" 2005. Dr. Goudy opined Plaintiff's anxiety symptoms appeared to "remain relatively unchanged" since February 2005 (R. 482). Dr. Goudy noted Plaintiff had been prescribed Paxil and Tomazepam by a psychiatrist at Seneca Health Services and Xanax by his primary care physician. Dr. Goudy also noted Plaintiff was not and had never undergone psychotherapy; however, Plaintiff stated "his psychiatrist [was] providing psychotherapy during their monthly medication management appointments" (R. 483).

Dr. Goudy administered the Beck Depression Inventory II. He scored 55, which was significantly higher than the 35 he scored in February, 2005 (R. 483). Dr. Goudy found Plaintiff's depression was "significantly worse" (R. 484). Dr. Goudy noted Plaintiff's most severe symptoms "included sadness, pessimism, feeling like a failure, loss of pleasure, guilt, self criticalness, agitation, loss of interest, difficulty making decisions, feelings of worthlessness, loss of energy, sleep disturbances, irritability, concentration problems, general fatigue, and decreased libido. Dr. Goudy opined the BDI-II results were "not surprising" because Plaintiff had reported that Paxil did not "significantly reduce his depression," and his doctor continued to prescribe Paxil to him for his depression symptoms (R. 483).

Plaintiff scored 23 on the Beck Anxiety Inventory; he scored 24 in February, 2005. Dr. Goudy opined the scores were "essentially consistent." Dr. Goudy noted Plaintiff was taking two separate medications that were prescribed by two separate physicians to treat his anxiety, and those "medications [had] at least been able to keep his anxiety from worsening" (R. 483).

Dr. Goudy diagnosed major depressive disorder, recurrent and moderate, and generalized anxiety disorder. He found Plaintiff's GAF to be 50-55. Dr. Goudy found, due to the combination of Plaintiff's depression and anxiety symptoms, his activities of daily living were mildly to

29

moderately impaired; social functioning was moderately impaired; and concentration, persistence, and pace were markedly impaired. Dr. Goudy found Plaintiff had experienced no episodes of decompensation (R. 484). Dr. Goudy found Plaintiff did not meet a Listing (R. 485).

In comparing Plaintiff's February, 2005, condition to his condition during this evaluation, Dr. Goudy opined that, due to Plaintiff's increased depression, his activities of daily living had "worsened from mild impairment [February, 2005] to mild to moderate impairment"; his social functioning had changed from mildly to moderately impaired [February, 2005] to "at least moderately impaired"; and his ability to interact appropriately with the public had changed from "fair" [February, 2005] to "poor" (R. 485).

Administrative Hearing

Plaintiff testified at the December 14, 2005, administrative hearing that pain in his lower and mid-thoracic back prevented from working (R. 496). Plaintiff testified he began psychiatric treatment four or five months prior to the hearing (R. 496-97). Plaintiff stated he no longer hunted or fished. Plaintiff testified he did not "go out much" or do lawn chores. Plaintiff stated he did not do any housework, such as cleaning, cooking, dusting, laundry, or washing dishes (R. 498). Plaintiff testified he drove to grocery shop, he drove his daughters to school, and that he drove to the hearing, which took one hour (R. 494, 498, 500). Plaintiff testified he could carry a small bag of groceries. He stated he watched television for four to six or more hours per day (R. 498). Plaintiff testified he was not able "to follow the story . . . much." Plaintiff read newspapers and listened to the radio. Plaintiff stated he retired between 11:00 p.m. and 12:00 a.m. and awoke at 6:30 a.m. Plaintiff testified he did not sleep well, but did not nap during the day. Plaintiff stated he smoked one and one-half packages of cigarettes per day (R. 499). Plaintiff stated he could sit for thirty minutes; he

30

could stand for thirty minutes; and he would walk for fifteen to twenty minutes. Plaintiff could lift ten or fifteen pounds "once in a while" (R. 500).

Plaintiff testified at the administrative hearing that his back pain was "stabbing" and that he had muscle spasms in his mid and lower back. Plaintiff stated he could not walk for long periods of time because his "back lock[ed] up" and his "legs [got] weak." Plaintiff stated he experienced panic attacks at night and difficulty with concentration (R. 501). Plaintiff testified he had feelings of worthlessness, had headaches two to four times per week, and numbness and weakness in his legs (R. 502). Plaintiff stated he had difficulty completing tasks due to pain and lack of concentration. Plaintiff testified he partook in no activities outside his home; he described himself as "a hermit inside [his] house." Plaintiff stated he experienced numbness in his arms and hands and he had difficulty grasping (R. 504). Plaintiff testified he had difficulty turning his head. According to Plaintiff's testimony, the treatment he received at the Pain Clinic helped to alleviate his pain (R. 505). Plaintiff stated he felt hopeless (R. 506).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Toschi made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008 (R. 20).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b)) (R. 20).

3. The claimant has the following severe impairments: neck pain disorder, back pain disorder, major depressive disorder and anxiety disorder (20 CFR 404.1520(c)) (r. 20).

4. The claimant does not have an impairment or combination of impairments that meets

31

or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20CFR 404.1520(d), 404.1525 and 404.1526) (R. 24).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. He is unable to climb ropes, ladders or scaffolds. He can occasionally climb, balance, stoop, kneel, crouch and crawl. His ability to reach in all directions is limited by neck pain. He must avoid exposure to extreme cold. He must avoid even moderate exposure to heat, noise and hazards, including use of machinery. He can understand, remember and carry out simple instructions and tasks only. He is limited to positions that would allow for only limited contact with the public and coworkers. Also, he might require extra supervision to assure he would finish assigned tasks (R. 25).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565) (R. 28).

7.      The claimant was born on May 24, 1960, and was 41 years old on the alleged disability onset date, which is defined as a younger individual (20 CFR 404.1563 (R. 29).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 29).

9.      Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568) (R. 29).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566) (R. 29).

11.      The claimant has not been under a "disability," as defined in the Social Security Act, from January 31, 2002, through the date of this decision (20 CFR 404.1520(g)) (R. 30).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred in concluding Plaintiff had a residual functional capacity to perform limited light work.

    a. The ALJ made an erroneous assessment of Plaintiff's pain and other non-exertional limitations.

2. The ALJ erroneously concluded that Plaintiff could perform "other work" which exists in significant numbers in the national economy.

The Commissioner contends:

1.      The ALJ correctly evaluated the medical evidence of record and found Plaintiff's
        testimony not entirely credible.

2.      Substantial evidence supports the ALJ's finding that Plaintiff can perform "other
        work" in the economy.

## C. RFC

Plaintiff contends ALJ erred in concluding Plaintiff had a residual functional capacity to

perform limited light work. Specifically, Plaintiff argues the ALJ found Plaintiff could perform the

requirements of limited light work in spite of the findings to the contrary by Arthur Smith, Jr., a

physical therapist at Gauley Bridge Physical Therapy (Plaintiff's brief at p. 10). Defendant contends

the ALJ correctly evaluated the medical evidence of record.

The ALJ found the following:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to lift and carry 20 pounds occasionally
> and 10 pounds frequently. He is unable to climb ropes, ladders or scaffolds. He can
> occasionally climb, balance, stoop, kneel, crouch and crawl. His ability to reach in
> all directions is limited by neck pain. He must avoid exposure to extreme cold. He
> must avoid even moderate exposure to heat, noise and hazards, including use of
> machinery. He can understand, remember and carry out simple instructions and tasks
> only. He is limited to positions that would allow for only limited contact with the
> public and coworkers. Also, he might require extra supervision to assure he would
> finish assigned tasks. In making this finding, the undersigned considered . . . opinion
> evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p,
> 96-5p and 96-6p (R. 25).

In his February 25, 2004, FCE, Physical Therapist Smith found Plaintiff could perform

sedentary light level work (R. 321). Plaintiff pointed to certain findings made by Physical Therapist

Smith in that report. Specifically, Plaintiff noted Physical Therapist Smith found Plaintiff could sit,

stand, squat, climb, use leg controls no more than 1/3 of a workday; bend less than one percent of

a workday; use arm controls no more than 2/3 of a workday; no lifting overhead; and could not

34

shoulder lift more than five pounds frequently or ten pounds occasionally (Plaintiff's brief at p. 11).

Plaintiff argues that Physical Therapist Smith's test findings reflected, "from strictly a physical

perspective alone, [Plaintiff] can perform the physical requirements of light nor [sic] sedentary

work" (Plaintiff's brief at p. 11). Plaintiff asserts the ALJ erred in not giving "greater weight to this

testing" (Plaintiff's brief at p. 12).

In his decision, the ALJ did not consider the findings or weigh the opinion of Physical

Therapist Smith in determining Plaintiff's RFC. He was not required to do so, because a physical

therapist is not a an accepted medical source and is not qualified to make a medical assessment of

Plaintiff's ability to do work.

20 C.F.R. §416.913 provides as follows:

(a) . . . We need evidence from acceptable medical sources to establish whether you
have a medically determinable impairment(s). . . . Acceptable medical sources are:
(1) Licensed physicians (medical or osteopathic doctors);
(2) Licensed or certified psychologists. . . .
(3) Licensed optometrists . . . .
(4) Licensed podiatrists . . . .
(5) Qualified speech-language pathologists . . . ."
(d) Other sources. In addition to evidence from the acceptable medical sources listed
in paragraph (a) of this section, we *may* also use evidence from other sources to show
the severity of your impairment(s) and how it affects your ability to work or, if you
are a child, how you typically function compared to children your age who do not
have impairments. Other sources include, but are not limited to –
(1) Medical sources not listed in paragraph (a) of this section (for example, . . .
therapists) (emphasis added).

*See also* 20 CFR 404.1513(d)(1); 404.1527(a)(2); 416.927(a)(2).

Nothing in this regulation requires an ALJ to consider the opinion of a physical therapist.

Additionally, the Fourth Circuit, in *Lee v. Sullivan*, 945 F.2d 687, 691 (1991), has held that those

other than "an 'acceptable medical source'" do "not qualify . . . to make a 'medical assessment' on

a Social Security claimant's 'ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling'" and their "assessment can qualify only as a layman's opinion." In determining Plaintiff's RFC in the instant case, the ALJ relied the following opinions of the examining and treating physician – acceptable medical sources – which he found to be consistent with the objective evidence of record:

- The October 9, 2002, opinion of Dr. Bachwitt that Plaintiff could return to sedentary and light work;

- The February 21, 2003, opinion of Dr. Loimil that Plaintiff could return to light duty work;

- The January 14, 2004, opinion of Dr. Fernandes that Plaintiff could return to light duty work, such as operating a cash register;

- The June 24, 2004, opinion of Dr. Snead that Plaintiff could lift up to twenty to 25 pounds and could return to light duty work; and

- Dr. Loimil's release of Plaintiff to light duty work on August 30, 2004 (R. 27).

Additionally, the ALJ relied on the opinion of the two state agency physicians in determining Plaintiff RFC. The ALJ considered the May 24, 2004, opinion of the state agency physician, which was that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk and for about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, climb; never climb ropes; limited in his reaching; avoid moderate exposure to extreme heat, vibration, and hazards; and avoid concentrated exposure to extreme cold (R. 27-28). The ALJ considered and weighed the October 6, 2004, opinion of Dr. Rafael that Plaintiff retained a RFC to perform light work (R. 28).

The undersigned finds the ALJ's decision that Plaintiff's residual functional capacity was for light work is supported by substantial evidence.

## D. Credibility

Plaintiff contends the ALJ made an erroneous assessment of Plaintiff's pain and other non-exertional limitations. Defendant asserts the ALJ correctly evaluated the medical evidence of record and found Plaintiff's testimony not entirely credible.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.*; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§

416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594.

The undersigned finds the ALJ fully complied with the first threshold step in *Craig*, finding Plaintiff had "produced evidence of impairments that could reasonably be expected to cause the type of pain he alleges . . ." (R. 26). The ALJ was, therefore, required to "proceed to the second part of the pain analysis," which he did (R. 26). As noted above, step two of *Craig* requires the ALJ to "take into account not only the claimant's statements about [his] pain, but also 'all the available evidence,' including the claimant's medical history, medical signs, and laboratory findings, . . . any objective medical evidence of pain . . . and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it."

Plaintiff's specific contention is that the ALJ did not give "any credible reasons for finding that [Plaintiff] was not credible as to the severity of his pain and limitations caused by his depression" (Plaintiff's brief at p. 13). Contrary to Plaintiff's argument, the ALJ considered all the second-step factors relative to Plaintiff's pain and depression. The ALJ discussed Plaintiff's medical history, his medical signs, laboratory findings, objective evidence of pain, Plaintiff's daily activities, the medical treatment he took to alleviate his pain, and Plaintiff's statements about his pain and limitations.

In conducting the credibility analysis relative to Plaintiff's pain, the ALJ considered medical evidence, which included the December 21, 1999, MRI of Plaintiff's lumbar spine, which revealed

disk space narrowing at L5-S1, posterior osteophytes at L5-S1 and generalized bulging without herniation at L4-5 and L5-S1; the March 9, 2002 x-ray that showed severe degenerative changes at L5-S1 with marked narrowing and vacuum phenomena, hypertorphic changes of L4 and L5 and no abnormal translation on flexion and extension; the April 13, 2002, lumbar spine MRI that showed only mild degenerative changes at L4-5 and L5-S1; the July 31, 2003, thoracic x-ray that showed only some spondylosis and the lumbar spine x-ray that revealed prominent degenerative disc disease at L5-S1, facet arthrosis and hypertrophy with spurring/arthritic degenerative changes; the August 13, 2003, cervical spine MRI that showed C5-6 disc herniation and thoracic spine MRI that showed left-sided bony hypertorphy and "perhaps" minimal disc bulges (R. 21).

The ALJ weighed and considered the following objective medical opinions and diagnoses relative to Plaintiff's back condition: Dr. Ranavaya's June 12, 2000, opinion that Plaintiff could return to light work; during 2000, Plaintiff underwent conservative medical treatment for his lumbar back pain; Dr. Loimil's March 9, 2002, diagnosis that Plaintiff had a lumbosacral strain superimposed on arthrosis; Dr. Bachwitt's October 9, 2002, opinion that Plaintiff could perform sedentary to light work; Dr. Loimil's February 21, 2003, opinion that Plaintiff could perform light work; the opinion of Dr. Amores, who recommended on September 11, 2003, that Plaintiff undergo conservative treatment for his cervical and thoracic pain; the January 14, 2004, opinion of Dr. Fernandes, that Plaintiff had status post lumbosacral strain, degenerative disc disease at L4-5 and L5-S1, chronic low back pain syndrome and history of whiplash injury, but could perform light work; the June 24, 2004, opinion of Dr. Snead that Plaintiff could lift up to twenty to 25 pounds and could return to light work; Dr. Loimil's release of Plaintiff to light work on August 30, 2004; the March 30, 2005, opinion of Physician's Assistant Johnson that she did not "really understand or

recognize any findings on [Plaintiff's] last MRI that would indicate [Plaintiff] need[ed] to have chronic pain medication"; Dr. Olson's June 15, 2005, diagnosis of chronic lumbosacral pain; and a diagnosis rendered on August 11, 2005, at an emergency room, for chronic low back pain (R. 21-22, 27).

The ALJ also discussed that Plaintiff sought and was prescribed medication for treatment of his pain and that Plaintiff's pain was being treated conservatively with medication and a TENS unit and without surgery or even steroid epidural injections. Additionally, the ALJ noted Plaintiff was "instructed to get up and start moving around and not just sit around doing nothing" because his "pain was reported to be in places that [were] muscular" (R. 22, 25).

Contrary to Plaintiff's argument, the ALJ did acknowledge the physical therapy that Plaintiff had undergone.[3] Plaintiff stated on October 22, 2003, that his pain was "help[ed] a lot" by physical therapy" and was "rated down to . . . a three and four . . . without radiation." Plaintiff had been working out at physical therapy for one hour at a time, was having no significant problems, and his range of motion had improved. Finally, the ALJ considered that on December 22, 2003, Plaintiff was discontinued from physical therapy due to his "poor compliance/motivation" (R. 21).

In evaluating Plaintiff's credibility, the ALJ properly noted inconsistencies in Plaintiff's reports of his pain. The ALJ found:

> There are several inconsistencies in the record. Although the claimant alleges severe pain, the record indicates that on October 22, 2003, he reported physical therapy was helping a lot and that his pain was rated down to between a three and four out of ten.

---

[3]Plaintiff's argument that the ALJ erred because he did not "give any credible reasons for finding that [Plaintiff] was not credible as to the severity of his pain" based on the "objective functional capacity testing performed by Gauley River Physical Therapy" is without merit, because, as discussed earlier in this Opinion/Report and Recommendation, a physical therapist is not an accepted medical source.

On February 9, 2004, the claimant reported his pain was at a level two or three with medications. On April 2, 2004, the claimant reported his pain was a level two out of ten with medication (Exhibit 23F). . . . Although the claimant has indicted inability to return to work, his treating source reported he was not told to stay off work. He was given an excuse from work only through September 15, 2003. Furthermore, the physical therapy reported on December 15, 2003, that the claimant had been working out for an hour each time and really was not having any significant problems during the period of time (Exhibit 29F). (R. 27).

The ALJ also considered Plaintiff's activities of daily living. Even thought Plaintiff drove the one hour to the administrative hearing and had been able to carry his twin children, the ALJ noted Plaintiff "greatly minimized his activity level" (R. 22, 25, 27). The ALJ noted Plaintiff did not leave the house often, did not perform any yard work, dressed himself slowly, did not perform housework, went to the grocery store with his wife, slept four to five hours per night, read the newspaper, watched television most of the day, listened to the radio, and drove his children to school (R. 25). The ALJ found the above considered and discussed "objective medical findings and degree of treatment [did] not provide a basis for such limitations," limitations which the ALJ rated as "mild" (R. 24, 27).

As to the ALJ's credibility analysis of Plaintiff's depression, Plaintiff contends the ALJ did not "give any credible reasons for finding that [Plaintiff] was not credible as to the . . . limitations caused by his depression"; specifically, the "severe mental impairments diagnosed in psychologist Goudy's two evaluation reports [that] substantiate his complaints of concentration and memory problems, persistence and pace . . ." (Plaintiff's brief at p. 13). Contrary to Plaintiff's argument, the ALJ did consider and analyze Dr. Goudy's opinions relative to Plaintiff's depression and anxiety; however, the ALJ afforded "little weight" to Dr. Goudy's opinions "as they [were] not well-

supported or adequately explained" (R. 27).[4] The record does show the ALJ considered the step-two factors as required in *Craig* analysis.

The ALJ considered the objective medical evidence of Mr. Spaulding, who found, on December, 23, 2002, that Plaintiff's mood was solemn, his affect was constricted, his delayed memory was mildly restricted, but the rest of his examination was normal. On that date, Mr. Spaulding diagnosed Plaintiff with general anxiety disorder and mood disorder, not other wise specified. The ALJ considered the February 4, 2005, findings of Dr. Goudy, who diagnosed Plaintiff with generalized anxiety accompanied by motor tension, autonomic hyperactivity and apprehensive expectation, and who found Plaintiff's activities of daily living were mildly restricted, social functioning was mildly to moderately impaired, and his ability to maintain concentration, persistence, or pace was markedly impaired. The ALJ also considered the June 7, 2005, findings of Mr. Hagerty, who diagnosed Plaintiff with major depressive disorder, moderate, recurrent. The ALJ considered the December 2, 2005, findings of Dr. Goudy, who opined Plaintiff's activities of daily living were mildly to moderately deficient, his social functioning was moderately limited, and his ability to maintain concentration, persistence or pace was markedly impaired, an opinion to which the ALJ afforded "little weight" (R. 23, 28).

The ALJ also assessed Plaintiff's medical treatment for depression. He noted Plaintiff was prescribed Paxil on February 8, 2002, and Xanax on March 30, 2005, after he requested a prescription for that medication. The ALJ noted Plaintiff "had taken some of his wife's Xanax and had immediate relief of his anxiety and depression. He was prescribed Xanax" (R. 23).

---

[4]A full analysis of the ALJ's decision relative to the weight he afford the opinions of Dr. Goudy will be provided in the subsequent section of this Opinion/Report and Recommendation, that section addressing Plaintiff's performing "other work" in the national economy.

As noted above, the ALJ considered Plaintiff's activities of daily living. The ALJ also noted inconsistencies in Plaintiff's statements and the record relative to his limitations caused by anxiety and depression. The ALJ noted Plaintiff reported he avoided contact with people, but he found the "record indicate[d] the claimant has no difficulty relating with family members." Additionally, as to Plaintiff's social functioning, the ALJ found "[t]reatment notes throughout the record indicate[d] normal social functioning." The ALJ also "observed the claimant to behave in a socially appropriate manner throughout the hearing." The ALJ considered Plaintiff's testimony that he had difficulty concentrating on television shows and found it inconsistent with his observation of Plaintiff's ability to "maintain adequate attention and concentration at the hearing in order to answer questions without significant difficulty." Additionally, Plaintiff's claim that he had difficulty maintaining concentration during television programs was not supported by the evidence of record which showed concentration within normal limits (R. 24).

Based on the above analysis, the undersigned finds substantial evidence, specifically, Plaintiff's medical history as it appears in the record, objective medical signs, the objective medical evidence, the evidence of the Plaintiff's daily activities, Plaintiff's descriptions of limitations, the evidence of medical treatment to alleviate limitations, and the inconsistencies of Plaintiff's statements and the evidence of record supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and limitations caused by depression.

### E. Substantial Gainful Employment

Plaintiff contends the ALJ erroneously concluded that Plaintiff could perform "other work" which existed in significant numbers in the national economy. Defendant asserts substantial evidence supported the ALJ's finding that Plaintiff could perform "other work" in the economy

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

The hypothetical posed to the VE by the ALJ was as follows:

. . . He would be unable to climb a rope, ladder or scaffold. He would be limited to occasional climbing, balancing. Climbing would be stairs and ramps for the occasional, also occasional balancing, stooping, kneeling, crouching and crawling.

44

His ability to reach in all directions is limited by neck pain. He should avoid concentrated exposures to extreme cold. He should avoid moderate exposure to extreme heat, noise and hazards, including use of machinery. In addition he would be limited to understanding, remembering and carrying out simple instructions or tasks only. He would be limited to positions that would allow for only limited contact with the public and co-workers. And he might require extra supervision to ensure that he finished assigned tasks (R. 509).

Plaintiff asserts this hypothetical is incomplete because it did not include limitations found by Physical Therapist Smith and Dr. Goudy. Specifically, Plaintiff argues that "[w]hen the vocational witness was presented with a hypothetical consistent with the residual functional capacity assessment performed by Gauley River Physical Therapy, he [the VE] concluded that the [Plaintiff] would be incapable [sic] performing substantial gainful employment" (Plaintiff's brief at p. 14). Plaintiff's counsel questioned the VE about limitations found in the FCE of Physical Therapist Smith; specifically, he asked if the jobs listed by the VE would be available to a person who could not sit or stand more than one-third of a day, could not frequently lift more than five pounds at shoulder level more than one-third of a day, or could not perform any other kind of lifting other than occasional lifting for one-third of the day. The VE said there would be no jobs (R. 512-13).

As discussed above, a physical therapist is not an acceptable medical source; therefore, an ALJ is not required to consider the evidence offered by a physical therapist in determining how the severity of Plaintiff's impairment affects his ability to do work as he is required to consider evidence from licensed physicians, certified psychologists, optometrists, licensed podiatrists, and qualified speech-language pathologists. *See* 20 C.F.R. §416.913(a)(d). *See also* 20 CFR 404.1513(d)(1); 404.1527(a)(2); 416.927(a)(2). The ALJ was, therefore, not required to accept the limitations presented by the VE in response to Plaintiff's counsel's question that was based on evidence offered by a physical therapist. The undersigned, therefore, finds substantial evidence supports the ALJ's hypothetical posed to the VE.

45

Plaintiff's asserts that the ALJ's hypothetical was incomplete because it did not "fairly set out all the claimant's impairments," including some of those found by Dr. Goudy. Plaintiff argues that, "[w]hen asked to assume the mental impairments determined by Psychologist Goudy in two test assisted evaluations conducted a year apart revealing inability to maintain attention and concentration for extended periods or inability to perform at a consistence [sic] pace or being unable, at least for part of a day, to carry out simple instructions, or unable to perform activities within a schedule, maintain regular attendance and be punctual, the witness [the VE] stated that he [the Plaintiff] would be unable to work" (Plaintiff's brief at p. 14).

First, Plaintiff's argument that Dr. Goudy found Plaintiff was unable to "carry out simple instructions" and "perform activities within a schedule, maintain regular attendance and be punctual" is without merit. The record of evidence shows that Dr. Goudy found, on March 18, 2005, that Plaintiff's ability to carry out simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual was "fair" (R. 453). His opinion did not change in his December, 2005, evaluation (R. 482-85).

In his decision, the ALJ found "Dr. Goudy's opinions are . . . not well-supported or adequately explained. They are inconsistent with Dr. Goudy's own evaluation, including the Global Assessment of Functioning scores" (R. 28). Specifically, the ALJ noted Dr. Goudy's express findings that, on March 18, 2005, Plaintiff's ability to remember locations and work-like procedures; understand and remember short, simple instructions; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers; maintain socially appropriate behavior; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others was good. The ALJ also considered

46

Dr. Goudy's March 18, 2005, finding that Plaintiff's ability to carry out short, simple instructions; perform activities within a schedule; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; interact appropriately with the public; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions was fair. The ALJ noted Dr. Goudy found, on March 18, 2005, that Plaintiff's ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; complete a normal workday or workweek; and perform at a consistent pace was poor (R. 28). Plaintiff's GAF was 55-60 (R. 451). The ALJ noted that in the December 2, 2005, evaluation, Dr. Goudy's only change was that Plaintiff's ability to interact appropriately with the public had changed from "fair" to "poor" (R. 28). His GAF was listed as 50-55 (R. 484). Even though Dr. Goudy's findings remained virtually unchanged and Plaintiff's GAF was stable, Dr. Goudy did not "adequately explain" his December 2, 2005, opinion that Plaintiff's "depression [was] significantly worse" than it was in March of that year. There was no additional evidence of record that supported Dr. Goudy's opinion that Plaintiff's depression had worsened as of December, 2005.

The ALJ noted Plaintiff had mild limitations in his activities of daily living and moderate limitations in his ability to maintain social functioning. As to Plaintiff's "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," which included Plaintiff's "ability to sustain focused attention sufficiently long [enough] to permit timely completion of tasks commonly found in work setting," the ALJ found Plaintiff's limitations to be moderate (R. 24). He based that finding on the opinion of Mr. Spaulding, who found, except for mildly deficient delayed memory, Plaintiff's psychological evaluation was within normal limits. The

ALJ considered Mr. Spaulding's impression of "general anxiety disorder and mood disorder, not otherwise specified" (R. 23). Additionally, the ALJ considered Plaintiff's March 30, 2005, statement that he had taken "some of his wife's Xanax and had immediate relief of his anxiety and depression"; consequently, Plaintiff was prescribed Xanax (R. 23). The ALJ noted he observed Plaintiff during the administrative hearing, and he found Plaintiff was able to "maintain adequate attention and concentration at the hearing in order to answer questions without significant difficulty" (R. 24).

The ALJ explained why he rated Plaintiff's degree of limitation as to his concentration, persistence, and pace as moderate. He explained his assessment of the evidence of record as to Dr. Goudy's opinions. The undersigned finds the ALJ took into account Plaintiff's mental limitations that were supported by the record in crafting his hypothetical to the VE. The undersigned, therefore, finds substantial evidence supports the ALJ's determination that "other work" in significant is available to Plaintiff in the local and national economies.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment or, in the Alternative, for Remand be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District

Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __29__ day of __May__, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE