**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**TIMOTHY W. WOODS,**

       **Plaintiff,**


**v.**                          **CIVIL ACTION NO. 1:06CV120**
                                        **(Judge Keeley)**


**COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION,**

       **Defendant.**


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules
of Civil Procedure and Local Court Rule 4.01(d), on August 9, 2006,
the Court referred this Social Security action to United States
Magistrate John S. Kaull with directions to submit proposed
findings of fact and a recommendation for disposition. On May 29,
2007, Magistrate Kaull filed his Report and Recommendation and
directed the parties, in accordance with 28 U.S.C. §636(b)(1) and
Rule 6(e), Fed. R. Civ. P., to file any written objections with the
Clerk of Court within ten (10) days after being served with a copy
of the Report and Recommendation. On June 19, 2007, plaintiff,
Timothy W. Woods, through counsel, Gregory W. Evers, filed
objections to the Report and Recommendation.

## I.  PROCEDURAL BACKGROUND

On December 31, 2003, Timothy W. Woods ("Woods") filed an
application for Disability Insurance Benefits ("DIB") alleging

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

lumbar and cervical herniated and bulging discs, muscle spasms, and pain and numbness in the fingers on both hands.[1]  The Commissioner denied the application initially  and on reconsideration.  On December 14, 2005, an Administrative Law Judge ("ALJ") conducted a hearing at which Woods, represented by counsel, testified on his own behalf.  A Vocational Expert ("VE") also testified.

On February 24, 2006, the ALJ determined that Woods was not disabled and was capable of performing a limited range of light work.  On June 19, 2006, the Appeals Council denied Woods' request for review. On August 8, 2006, Woods filed this action seeking review of the final decision.

## II.  PLAINTIFF'S BACKGROUND

Woods was born on May 24, 1960, and, at the time of the administrative hearing, was 45 years old.  He has a high school education and past relevant work history that includes employment as a grocery store clerk.

_____

[1] On August 1, 2002, Woods applied for DIB.  On January 24, 2003, the Commissioner denied the August 1, 2002 application and Woods did not file a request for reconsideration. Pursuant to 20 CFR §§ 404.900(b) his non-disability status as of that date is binding, thus Woods must now demonstrate disability as of January 24, 2003.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

### III.   ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), the ALJ determined that:

1.  Woods met the insured status requirements of the Social Security Act through December 31, 2008;

2.  Woods has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b));

3.  Woods has the following severe impairments, neck pain disorder, back pain disorder, major depressive disorder and anxiety disorder that do not, individually or in combination, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20CFR 404.1520(d), 404.1525 and 404.1526);

4.  Woods has the residual functional capacity to lift and carry 20 pounds occasionally, to lift and carry 10 pounds frequently, climb ropes, ladders or scaffolds, occasionally climb, balance, stoop, kneel, crouch and crawl, reach in all directions with a limitation for neck pain, must avoid exposure to extreme cold, can have moderate exposure to heat, noise and hazards, including use of machinery, can understand, remember and carry out simple instructions and tasks only, is limited to positions that would allow for only limited contact with the public and coworkers and might require extra supervision to assure he would finish assigned tasks;

5.  Woods is unable to perform any past relevant work (20 CFR 404.1565);

6.  Woods was 41 years old on the alleged disability onset date and is defined as a younger individual (20 CFR 404.1563;

7.  Woods has at least a high school education and is able to communicate in English (20 CFR 404.1564);

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

8.    Transferability of job skills is not material to the
      determination of disability due to Woods' age (20 CFR
      404.1568);

9.    Considering Woods' age, education, work experience, and
      residual functional capacity, there are jobs that exist
      in significant numbers in the national economy that he
      can perform (20 CFR 404.1560(c) and 404.1566);  and

10.   Woods has not been under a "disability," as defined in
      the Social Security Act, from January 31, 2002, through
      the date of this decision (20 CFR 404.1520(g)).

## IV.   PLAINTIFF'S OBJECTIONS

Woods objects to the Magistrate Judge's report and
recommendation, alleging as error the following

1.    the ALJ's decision that Woods retained a residual
functional capacity for light work;

2.    the ALJ's credibility determination regarding Woods'
allegations of pain and other non-exertional limitations; and

3.    the ALJ's omission of the limitations contained in the
FCE report of physical therapist Smith and the psychological report
of Dr. Goudy in his hypothetical question to the VE.

## V.   MEDICAL EVIDENCE

The medical evidence of record includes:

1.    A November 1, 1982 letter from A. C. Velasques, M.D.,
indicating that in October of 1982 Woods injured his back while
lifting heavy objects at work.  Dr. Velasquez recommended extensive
therapy followed by myelographic studies if therapy failed;

4

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

2.    A March 25, 1983 letter from Dr. Elwood H. Heilman, M.D., indicating that, in his opinion, Woods had reached maximum medical improvement, required no further treatment and did not have a permanent partial disability;

3.    An October 27, 1983 letter from Jack Pushkin, M.D., indicating that, in his opinion, Woods had not reached maximum medical improvement and recommending that Woods return to the care of his physician for readmission to the hospital for further testing regarding a positive myelogram. Dr. Puskin indicated that Woods "may well have a herniated nucleus pulposus, L4, left, which may need to be pursued further";

4.    A December 14, 1983 letter from Dr. Velasquez indicating that a December 7, 1983 CT scan from Charleston General Hospital revealed a herniated nucleus pulposus on the left of L4-L5 and further indicating that Woods probably needed a lumbar laminectomy;

5.    A June 5, 1985 letter from Neurological Associates, Inc. indicating that Woods reported he was not taking any medication at all and that he requested and received a release to return to work;

6.    A July 8, 1999 letter from Luis A. Loimil, M.D., indicating  a diagnoses of acute lumbosacral sprain/strain "superimposed on disc degenerative disease and arthrosis of the lumbosacral spine". Dr. Loimil  instructed Woods to resume physical therapy;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

7.    An October 15, 1999 noted from Summersville Outpatient Center Family Practice indicating an elevated blood pressure of 164/110. Woods stated he was being treated by Eve Johnson, M.S., PA-C. He received a prescription for Toprol;

8.    A December 15, 1999 notation from Physician's Assistant Johnson ("PA Johnson") indicating the Toprol was controlling Woods' hypertension and continuing his prescription;

9.    A December 21, 1999 lumbar spine MRI indicating intervertebral disc space narrowing at L5-S1 level with "vacuum phenomenon", posterior osetophytes at the L5-S1 level and "generalized bulging without herniation of the L4-L5 and L5-S1 intervertebral discs";

10.   A January 28, 2000 note from Dr. Loimil indicating Woods was cleared to return to work at light duty;

11.   A March 24, 2000 note from Dr. Loimil indicating complaints of back pain and inability to tolerate work as a cashier. Dr. Loimil took him off work. Examination revealed flexion 45 degrees, hyperextension 10 degrees, right lateral tilt ten degrees, left lateral tilt 30 degrees with complaints of pain on all movements. Dr. Loimil recommended a second opinion from a neurologist;

12.   An April 27, 2000 report from Constantino Y. Amores, M.D., a neurologist, indicating Woods had degenerative disk disease

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

in his lower lumbar spine without neurological deficit, and recommending conservative, non-surgical treatment;

13. A May 11, 2000 note from PA Johnson indicating treatment of hypertension, a prescription for Avapro and ordering an echocardiogram. PA Johnson also recommended going back to physical therapy and doing exercises to strengthen the abdominal muscles to help his back;

14. A May 19, 2000 note from Dr. Loimil indicating he would seek authorization for treatment for pain management from Francis Saldanha, M.D.;

15. A June 12, 2000 Independent Medical Evaluation ("IME") from Mohammed I. Ranavaya, M.D., indicating Woods required no further treatment, was not disabled, had reached his maximum medical degree of improvement, and could return to work "as soon as he [chose] to do so";

16. A September 8, 2000 report from Francis M. Saldanha, M.D., a consulting physician, indicating a diagnosis of chronic lumbar strain with facet arthropathy and recommending a single injection to Woods' facet joints for pain management and further injections if there is satisfactory relief.

Examination revealed no difficulty ambulating, normal coordination tests, ability to squat and arise without difficulty, ability to perform calf raises, no peripheral edema, negative

straight leg raises, normal motor and sensory functions, normal tone and strength in all four extremities, marked reduction in range of motion of the back with some degree of guarding, and considerable tenderness over the left inferior lumbar facet joints. Dr. Saldanha stated Woods had reached maximum medical improvement and was able to return to work;

17. A September 8, 2000 report from Dr. Loimil indicating Woods requested, and was given, a slip to return to work on September 11, 2000;

18. A November 30, 2000 IME from Paul K. Forberg, M.D., indicating that he had reviewed the medical records and tests and also had examined Woods. Dr. Forberg diagnosed herniated nucleus pulposus, left L4-5, healed and chronic, recurrent, and non-specific back pain. He recommended that Woods "seek another job description that [did] not require heavy lifting, repetitive bending and stooping";

19. A January 30, 2001 report from PA Johnson indicating that Woods had stopped taking Avapro two to three months ago because the prescription expired, that he was feeling fine, that his blood pressure was 160/90 and that his EKG was normal. PA Johnson prescribed Protonix for his epigastric pain and ordered him to wear a Holter monitor for twenty-four hours. Woods indicated he would attempt to control his hypertension with diet and exercise;

20.  A February 8, 2002 note from James Shumate, D.O. of the
Summersville Outpatient Center Family Practice indicating a follow-
up examination with a diagnosis of anxiety and gastroesophageal
reflux disease. Dr. Shumate modified Woods' diet and prescribed
Protonix for his acid reflux condition and Paxil for his "nerves";

21.  A March 9, 2002 x-ray of the lumbar spine indicating
"severe degenerative changes of L5-S1 with marked narrowing and
vacuum phenomena, hypertrophic changes of L4, L5 and in the
flexion/extension views there is no abnormal translation";

22.  A March 9, 2002 Workers' Compensation Division form from
Dr. Loimil indicating Woods could stand unassisted, did not have
scoliosis, but had an antalgic lean, lumbar hypolordosis, and
lumbar hyperlordosis, was positive for a limp on the left, and
could fully squat.  Dr. Loimil diagnosed lumbosacral sprain/strain
and arthrosis, excused Woods from work, ordered an MRI and
prescribed Skelaxin and Vioxx;

23.  An April 13, 2002 report for a lumbar spine MRI from
Metro MRI indicating mild degenerative changes at L4-5 and L5-S1
and no evidence of herniated nucleus pulposus;

24.  An April 17, 2002 note from Dr. Loimil indicating an
unchanged diagnosis and an unimproved condition. Dr. Loimil
reported that review of the April 13, 2002, MRI revealed "mild

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

degenerative changes at L4-5 and L5-S1 and no evidence of disc
herniation." He prescribed Celebrex instead of Vioxx;

25. A September 30, 2002 IME from Dr. Bachwitt indicating
review of medical opinions and tests and finding that Woods had
reached maximum medical improvement and was capable of working at
the sedentary and light work levels;

26. An October 9, 2002 letter from Paul Bachwitt, M.D.,
indicating that Woods had reached maximum medical improvement
regarding his 1999 injury and could do federally defined sedentary
and light work;

27. An October 11, 2002 note from the Emergency Department of
Summersville Memorial Hospital indicating that Woods complained of
"coughing up blood." A x-ray of his chest showed "fine
interstitial change of lower lung fields and borderline
cardiomegaly with elongation of ascending aorta, otherwise
unremarkable". Woods was released to home;

28. An October 17, 2002 CT scan identifying interstitial
fibrosis, COPD, and borderline nonspecific mediastinal lymphnodes,
but no overt mediastinal mass or lymphadenopathy;

29. A November 11, 2002 note from Summersville Outpatient
Center Family Practice indicating that Woods blood pressure was
170/120. PA Johnson prescribed Avapro for hypertension and Lortab
for back pain;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

30.  A November 18, 2002 note from PA Johnson increasing the dosage of Avapro to 300 mg and noting that Dr. Loimil is treating Woods' back pain;

31.  A November 27, 2002 note from Dr. Loimil indicating Woods had been unable to have a "FCE". Dr. Loimil recommended that Woods "go ahead with the FCE and that he "need[ed] . . . [a rehabilitation] evaluation to see if they have anything to offer from the rehabilitation standpoint";

32.  A December 12, 2002 note from PA Johnson indicating a blood pressure of 150/100, a prescription for Avapro and HCTZ, a prescription for Lortab and informing him again that he would have to obtain any future prescriptions for Lortab from Dr. Loimil;

33.  A December 13, 2002 Disability Determination Evaluation for the West Virginia Disability Determination Service from Scott Spaulding, M.A., a Licensed Psychologist, indicating a good attitude, cooperation, "no problems with gait and posture", no ambulatory aids. Spaulding did not review any records and based his report solely on statements from Woods.

Woods reported treatment for back pain beginning in the 1980s, "problems with nerves . . . and depression" beginning in February, 2002, "significant anger" due to his employer, a stomach condition beginning in February, 2000 and high blood pressure diagnosed in February, 2002. Woods informed Spaulding that his stomach

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

"bother[ed] him frequently"; he had a "short fuse"; he had "decreased concentration and a little problem with memory"; he was "irritable and worrie[d] frequently"; he could not "control his worry"; he experienced a "loss of interest in activities and [was] frequently aggravated"; and he reported "guilty feelings because he [could not] provide for his family." Woods also reported sleep disturbances only sleeping five hours per night, weight fluctuation and little energy. Woods denied nightmares, crying spells, obsessive-compulsive traits or phobias, or suicidal or homicidal ideations.

Woods reported he had received "no significant mental health treatment" but had been treated at a hospital's emergency room in January, 2002, for nerves and anger. He reported that he had last drunk alcohol one year earlier, smoked one and one-half packages of cigarettes per day, no surgeries and physical therapy and work hardening programs for his back. His listed medications were Avapro, Protonix, Skelaxin, and Celebrex.

His activities of daily living included rising at 5:00 a.m., watching television, showering and dressing, eating breakfast in a restaurant, driving his daughters to school, watching television for three to four hours, using the computer for two hours, talking to his wife frequently during the day, and exercising thirty

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

minutes per day. He also stated he played guitar four or five times per week.

Spaulding indicated Woods' speech was relevant and coherent, that he was oriented as to time, person, and place; that his observed affect was constricted; his observed mood was solemn; his stream of thought was logical, sequential, and coherent; and his thought content revealed no hallucinations, delusional thinking, obsessive-compulsive traits, or phobias. Woods had normal psychomotor activity, judgment, and insight, normal immediate memory, mildly deficient delayed memory, normal remote memory, normal attention and concentration, normal social functioning, and normal persistence and pace.

Spaulding diagnosed: Axis I – general anxiety disorder and mood disorder, not otherwise specified; Axis II – none; Axis III – back pain by self report;

34. A January 10, 2003 note from Dr. Loimil indicating he agreed with the December 13, 2002, FCE that reflected that Woods could work at the light physical demand level and would benefit from active physical rehabilitation, such as physical therapy, to improve his strength, range of motion, and endurance;

35. A January 16, 2003 Psychiatric Review Technique from Debra L. Lilly, Ph.D., a state-agency psychiatrist, indicating affective disorders and anxiety-related disorders resulting in mild

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

limitations in his activities of daily living, ability to maintain

social functioning, ability to maintain concentration, persistence,

or pace and no episodes of decompensation;

36. A February 21, 2003 note from Dr. Loimil indicating Woods

could return to work at light duty and further indicating that

Loimil had discussed the FCE evaluation with Spangler and that,

even though the FCE was invalid, he recommended return to light

duty at Krogers;

37. An April 4, 2003 release to light duty work from Dr.

Loimil;

38. A June 4, 2003 note from Dr. Loimil indicating Woods did

not return to work. Woods stated "his claims manager ha[d] changed

his rehab worker". Woods asked for a prescription for Lortab and

stated "his claims manager said that it was okay." Dr. Loimil

refused to prescribe Lortab and instead prescribed Flextra for pain

and instructed him to return in three months;

39. A July 31, 2003 report from the Emergency Department of

the Summersville Memorial Hospital indicating complaints of neck

and back pain as a result of a motor vehicle accident and a

diagnosis of a sprain and strain related to neck, dorsal and lumbar

and a release to home as stable;

40. A July 31, 2003 chest x-ray from Summersville Memorial

Hospital indicating that a comparison with the October, 2002 x-rays

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

revealed no evidence for acute infiltrate with mild prominence to bronchovascular markings;

41.  A July 31, 2003 x-ray of the lumbar spine from Summersville Memorial Hospital indicating prominent degenerative disc disease at L5-S1, facet arthrosis, hypertrophy with spurring, and arthritic degenerative change;

42.  A July 31, 2003 x-ray from Summersville Memorial Hospital of the thoracic spine indicating no evidence for definite compression but positive for some spondylosis;

43.  An August 8, 2003 note from Summersville Outpatient Center Family Practice regarding a follow-up visit related to the visit to the Emergency Department of the Summersville Memorial Hospital for the motor vehicle accident indicating Dr. Shumate examined Woods regarding complaints of increased neck and upper back pain.  Dr. Shumate noted a blood pressure of 146/108, weight of 203 pounds, spasm in the trapezius area, especially on the left, decreased cervical flexion to about sixty degrees and reduced extension to twenty degrees.

Dr. Shumate indicated that the accident did "not appear to have worsened his degenerative disc disease of his lumbar spine." Dr. Shumate assessed neck and thoracic pain and hypertension, instructed Woods to continue Lodine, Flexeril and Lortab and ordered a neck and thoracic MRI;

15

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

44.  An August 13, 2003 cervical spine MRI report indicating disc herniation at C5-6 and a thoracic spine MRI indicating "left sided bony hypertrophy as well as perhaps minimal disc bulges at T8-9 and T9-10";

45.  An August 15, 2003 note from Summersville Outpatient Center Family Practice and PA Johnson indicating a possible minimal thoracic disk bulge and a herniated disk at C5-6. PA Johnson faxed the MRI results to Dr. Loimil and prescribed Lortab and Flexeril;

46.  An August 18, 2003 report from physical therapy at Summersville Memorial Hospital Sports Medicine Center indicating Woods received physical therapy five times during August, 2003;

47.  An August 20, 2003, note from Dr. Loimil indicating complaints of increased soreness in his lower back due to a motor vehicle accident. Dr. Loimil noted the accident "mainly affected the cervical and thoracic spine" and felt Woods should be seen by a neurologist. He was not released to work due to the accident;

48.  September 2, 4, 5, 9, 10, 13, 18, 23, 26, and 29, 2003 notes from physical therapy at Summersville Memorial Hospital Sports Medicine Center indicating Woods received physical therapy on these dates;

49.  A September 3, 2003 note from PA Johnson indicating a request for medication for neck pain because Dr. Loimil was not treating him for his neck pain and had referred him to a

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

neurosurgeon. Woods reported the physical therapy had "been
helpful."

PA Johnson refused to treat him for pain management and noted
a prescription for additional Lortab would exceed the monthly
limit. She further noted that his information had been forwarded
to a pain clinic and Neurologic Associates and that there was
nothing further she could do. PA Johnson also noted that she felt
any neurologist would treat Woods conservatively;

50. A September 3, 2003 note from Dr. Loimil indicating a
request for prescriptions for Lortab and Flexeril. Dr. Loimil
refused to provide those prescriptions and instructed Woods to
contact his family physician "as he is the one who prescribed
these";

51. A September 11, 2003 report from Dr. Amores, a
neurosurgeon, indicating displacement of cervical disk without
myelopathy. Dr. Amores recommended conservative and non-surgical
treatment;

52. A September 15, 2003 report from Wesley Olson, M.D., of
the Summersville Outpatient Center Family Practice, indicating
Woods requested pain medication for chronic pain that was an eight
on a scale of one to ten. Woods informed Dr. Olson that physical
therapy did not alleviate his pain.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

Examination revealed a minimally tender neck, no significant paraspinous spasm, good muscle strength bilaterally in the upper extremities, normal reflexes, good strength in the deltoids, equal bilaterally grips, and no interosseous atrophy. Dr. Olson diagnosed musculoskeletal neck strain and prescribed Lortab "to last until he sees the [Pain] Clinic on 9/24." Dr. Olson told Woods "that would be all [the Lortab] [he] would give him";

53. A September 24, 2003 report from the initial visit at the Know Pain Clinic. Examination by Henriot St. Gerard, M.D. revealed negative Spurling's test, negative ninety degree straight leg raise and negative Patrick's test bilaterally. Dr. Gerard assessed herniated nucleus pulposus at C5/6 and lumbosacral strain, prescribed Lortab and Flexeril and planned to begin treatment with epidural injections at the next visit. Dr. Gerard found no consultative evaluations with other physicians were necessary. Regarding depression and anxiety, Dr. Gerard indicated Woods was "doing okay" at that time. Dr. Gerard recommended continuation of the physical therapy.

Woods chief complaint was neck and low back pain. He denied numbness and stated his pain was at six to seven, seven being the worst in the past thirty days. He reported being involved in a motor vehicle accident on July 31, 2003.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

He also reported physical therapy three days per week,
sleeping six to seven hours per night, a good appetite, a
significant history of arthritis and anxiety, stress due to
financial difficulties, smoking one and one-half packages of
cigarettes per day and no use of alcohol or drugs. He listed his
drugs as Lortab and Flexeril;

54. October 2, 8, 10, 14, 16, 21, 28, 30, and 31, 2003, notes
from Summersville Memorial Hospital Sports Medicine Center
indicating physical therapy on these dates;

55. An October 22, 2003 report from Shishir Shah, M.S., M.D.,
of the Know Pain Clinic, indicating Woods reported the physical
therapy "help[ed] a lot" and that his pain had reduced to "3 and 4
out of 10 as an aching in the neck without any radiation", ability
to sleep seven hours per night, a fair appetite, and smoking one
and one-half packages of cigarettes per day. He listed his
medication as Flexeril and Lortab.

Examination revealed a supple neck, tenderness at C5 and T1
base of the paraspinous musculature midline, 5/5 bilaterally
strength, 45 degrees cervical spine range of motion on the right
and forty degrees on the left, full flexion and extension, and
negative subluxation, compression distraction, Lhermitte's, and
Spurling's. Dr. Shah continued Woods' medications, noted he would

consider epidural injections at the next visit, and recommended continuation of physical therapy;

56.  An October 29, 2003 Physical Residual Functional Capacity Assessment indicating Woods could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; had unlimited push and pull ability; was occasionally limited in climbing ramps, stairs, ladders, ropes, and scaffolds; could balance, stoop, kneel, crouch, and crawl. The examiner reduced Woods' RFC to light;

57.  November 4, 5, 7, 13, and 20, 2003, noted indicating physical therapy at Summersville Memorial Hospital Sports Medicine Center;

58.  A November 14, 2003 note from Dr. Loimil indicating no significant change in his condition;

59.  December 4, 17, 22, and 26, 2003, notes from Summersville Memorial Hospital Sports Medicine Center indicating physical therapy;

60.  A December 8, 2003 note from Dr. Shah of the Know Pain Clinic indicating Woods reported his pain as four on a scale of one to ten, no numbness, tingling, burning, or swelling, alleviation of pain by physical therapy, walking for exercise, sleeping five to six hours per night, a good appetite, and smoking one and one-half

packages of cigarettes per day. Woods listed his medications as Lortab and Flexeril.

Examination revealed a supple neck and tenderness in the paracervical musculature with trigger point noted in the right superior border of the trapezius muscle. Woods reported intermittent radicular symptoms into his right arm. Dr. Shah assessed a herniated nucleus pulposus at C5/6. He continued Woods' medications, deferred consideration of injectable therapy, did not recommend neurosurgical or psychological consults and encouraged continuation of physical therapy and home exercises;

61. A December 15, 2003, note from Summersville Outpatient Center Family Practice indicating a request for "an excuse for being off work over the past three months." PA Johnson noted Woods had only been to the pain clinic on September 15, 2003, and this date and that the physical therapist (Mike Elliott) reported that Woods had not had any "significant problems during that period of time", had "greatly improved" range of motion and could be discharged from physical therapy. She  instructed him to continue with pain management at the pain clinic and denied his request for a work excuse for the time frame he requested but did extend his excuse from August 22, 2003, to September 15, 2003, the date of Woods' last visit with her;

62.  A January 14, 2004 orthopedic evaluation from Joseph E. Fernandes, M.D., indicating Woods reported he had stopped smoking tens days ago, denied consuming alcoholic beverages, and denied having hypertension, diabetes, or cardiac conditions.  Woods stated he had injured his back on June 26, 1982, and November 8, 1991, at work and that his low back pain was present all the time.   He described his pain as a muscle spasm, denied radiation of pain to his legs, but reported occasional tingling and numbness in both thighs, lasting for a few minutes.

Woods listed his functional activities as being able to complete some household chores because his wife was pregnant, mowing the lawn during the summer, and deer hunting for two days during the past hunting season.

After review of medical records and tests and completion of a examination, Dr. Fernandes indicated ambulation without a limp, status post lumbosacral strain, degenerative disc disease L4-L5 and L5-S1, chronic low back pain syndrome, and history of whiplash injury as consequence of MVA. Dr. Fernandes noted that Woods had reached maximum medical improvement relative to his work-related injury on June 28, 1999 and  could return to work at light duty;

63.  A January 16, 2004 note from PA Johnson at Summersville Outpatient Center Family Practice, indicating that Woods had stopped taking his blood pressure medicine and had a blood pressure

of 160/100. PA Johnson prescribed Avapro and instructed weight loss and diet.  Woods reported that he stopped  smoking on January 1, 2004, that he felt "great" and that he did not have "any problems";

64.  A January 21, 2004 note from physical therapy at Summersville Memorial Hospital Sports Medicine Center indicating discharge due to "poor compliance/motivation" . . .  "secondary to patient not returning to clinic";

65.  A January 30, 2004 note from Dr. Loimil indicating that following an evaluation of Woods' back, Dr. Loimil felt he "need[ed] to undergo a repeat FCE to determine his limitations and/or capabilities as [he did] not evaluate patients from this standpoint . . . ." ;

66.  A February 9, 2004 report from Dr. Shah of the Know Pain Clinic indicating complaints of numbness in his fingers and burning in his neck.  Woods stated that his pain was at level two to three on a scale of ten with medication, that standing, sitting and cold exacerbated his pain and that heat alleviated his pain.  Woods informed Dr. Shah that he had not attended physical therapy as he had "been very busy" and been "told by the clinic not to go."  Dr. Shah noted there was no record of anyone at the clinic instructing Woods not to participate in physical therapy and conjectured that Woods was busy caring for his pregnant wife.

Woods reported walking for exercise, sleeping six to seven hours per night, having a good appetite, denied alcohol or tobacco use, and his medication as Lortab and Flexeril.

Dr. Shah's examination revealed Woods was alert and oriented times three, in no acute distress, supple neck, tenderness in the paracervical musculature bilaterally without trigger points, patient reported paresthesias in both hands, slightly decreased grip strength on the right, negative compression, distraction and Spurling's tests, and no radicular symptoms.

Dr. Shah diagnosed herniated nucleus pulposus at C5/6 with subjective cervical radiculopathy. He continued Woods' medications, determined no neurosurgical or psychological consults were warranted, and encouraged a return to physical therapy. Woods did not accept Dr. Shah's recommendation that he undergo injectable therapies;

67. A February 18, 2004 note from PA Johnson indicating prescriptions for Lotrel and Cozaar for treatment of hypertension and an order for an upper GI;

68. A February 24, 2004 report from Summersville Memorial Hospital indicating a normal upper GI series;

69. A February 25, 2004 note from PA Johnson indicating a blood pressure of 140/92 and prescriptions for Lotrel, Cozaar and Zocor and a return for evaluation in one week;

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

70. A February 25, 2004 a Functional Capacity Evaluation
Report from Arthur Smith, Jr., a physical therapist with Gauley
River Physical Therapy & Rehabilitation, LLC, indicating moderate
pain during testing, ability to frequently leg lift twenty pounds,
occasionally twelve-inch lift thirty pounds, occasionally shoulder
lift ten pounds, frequently shoulder lift five pounds, occasionally
carry fifteen pounds for thirty feet, frequently carry eight pounds
for thirty feet, occasionally push twenty pounds for thirty feet,
and occasionally pull twenty-five pounds for thirty feet.

Smith further indicated Woods could occasionally sit, stand,
squat, crawl, climb stairs, and use leg controls, could minimally
bend and constantly stand and walk, could frequently walk, reach,
and use arm controls and could work at the sedentary light level.

Smith recognized two courses of action as "feasible" regarding
a return to work. First, Woods could return to his cashier job
part-time and increase to full-time over a three-to-four week
period or he could enter into a work conditioning program and
progress to a work hardening program that would rehabilitate him
for his job. Second, if an alternative work position was the goal,
a determination should be made if Woods could immediately begin
work or should enroll in industrial rehabilitation for the job;

71. A March 5, 2004 report from Narciso Rodriquez-Cayro,
M.D., of the Know Pain Clinic, indicating complaints of constant

stabbing, aching type pain in his neck with no radiation but some numbness, burning, tingling, and swelling. Woods rated his pain at a four on a scale of one to ten with medication.

Woods reported being able to "function[] and . . . do things around the house like tak[e] out the trash" when he took his medication. Woods also reported walking for exercise, sleeping for six to seven hours per night, a good appetite, and no use of alcohol or tobacco and medications of Lortab and Flexeril.

Examination revealed Woods neck was supple and mild paracervical tenderness but good range of motion. He assessed herniated nucleus pulposus at C5/6. He continued Woods' medication but did not make a referral for neurosurgical, psychiatric, or new physical therapy consultations. Woods stated he would consider a future cervical epidural injection and he would continue to be as "active as possible with walking, range of motion exercises, and stretching";

72. An April 2, 2004 noted from Dr. Loimil indicating Woods' FCE showed he could work at the sedentary level and that the results were valid;

73. A April 2, 2004 report from Dr. Shah of the Know Pain Clinic indicting complaints that his neck and lower back pain was "2 out of 10 with medicine and [was] presently a 4, and 5 has been the worst in the last 30 days" and numbness and tingling in his

fingers and toes. Woods reported that heat alleviated his pain, that he walked for exercise, slept six hours per night, had a good appetite, did not use alcohol or tobacco and had prescriptions for Lortab and Flexeril.

Examination revealed mild tenderness in the paracervical musculature bilaterally with spasm, equal grips at 5/5 bilaterally, no exacerbation of pain with left and right rotation, but increased pain with flexion and extension.

Dr. Shah assessed herniated nucleus pulposus at C5/6 and prescribed Lortab and Flexeril. Woods deferred injectable therapy because he was "severely afraid of the injections." Dr. Shah found that neurosurgical or psychological consultations were not warranted and encouraged Woods to "be as active as tolerable";

74. A May 24, 2004 Physical Residual Functional Capacity Assessment from a state agency physician indicating Woods could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, unlimited ability to push/pull, occasionally climb ladders and scaffolds, balance, stoop, kneel, crouch, and crawl, could never climb ropes, was limited in his ability to reach in all directions, including overhead, had no limitations in handling, fingering, or feeling, had no visual or

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

communication limitations, had unlimited ability for exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, had to avoid concentrated exposure to extreme cold and should avoid even moderate exposure to extreme heat, hazards, and vibration;

75. A June 24, 2004 impairment evaluation from Joseph A. Snead, M.D., indicating Woods had injured his back at work in June, 1999, and had injured his neck and thoracic spine in a motor vehicle accident six months prior that did not injure his lumbar spine. Woods reported constant pain which he treated with Lortab and Flexeril.

Examination revealed Woods appeared "to be in some distress", walked without a limp, could squat with difficulty, had definite tenderness in the L4-5 area but no muscle spasm, had no motor weakness or numbness in his legs, had full knee extension, had positive supine straight leg raising test on the left at 25 degrees and on the right at forty degrees, had spinal range of motion of 34 degrees of lumbar flexion and zero degrees of extension.

Dr. Snead reviewed Woods' MRI and noted "a bulging 4-5 disc, which touch[ed] the thecal sac on some transverse cuts but . . . no gross herniation". He diagnosed degenerative arthritis of the lumbar spine at the L4-5 level with a bulging disc without evidence of nerve root compression, opined Woods had reached maximum medical

improvement but unable to return to work that required bending over, lifting more than 20 to 25 pounds, or required prolonged standing and recommended that Woods "need[ed] to go to school and be retrained as per Vocational Rehabilitation";

76.  A July 2, 2004 note from Dr. Loimil indicating Dr. Snead's IME revealed Woods could work at light duty. Dr. Loimil instructed Woods to increase his activities and return in three weeks to discuss being released to work at light duty;

77.  An August 20, 2004 note from Dr. Loimil indicating Woods was released for work at light duty beginning on August 30, 2004 and prescribing Flextra for pain;

78.  An October 6, 2004 Physical Residual Functional Capacity Assessment from Gomez A. Rafael, a state agency physician, indicating Woods could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, had unlimited ability to push/pull, could occasionally climb, balance, stoop, kneel, crouch, and crawl, was limited in his reaching in all directions, including overhead, but had no limitations in his ability to handle, finger, and feel, had no communicative limitations, was unlimited for exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts,

gases, and poor ventilation was unlimited, should avoid concentrated exposure to hazards, and had an RFC of light;

79. An October 15, 2004 note from Dr. Loimil indicating that Woods reported he was still working but was experiencing severe low back pain. Dr. Loimil encouraged him to continue to work;

80. An October 27, 2004 note from Dr. Loimil regarding a telephone call in which Woods stated he had "been unable to work since 10/15/04 due to low back pain . . . ." Dr. Loimil mailed a "slip . . . to [Plaintiff] . . . stating this";

81. A December 24, 2004 report from the Emergency Department of the Summersville Memorial Hospital indicating complaints of back pain, a prescription for Ultram and Skelaxin and a release to home in stable condition;

82. A December 29, 2004 report from Summersville Outpatient Center indicating that Woods complained of low back and neck pain and reported that he was not exercising or using heat or ice to treat his back and neck pain, that he had not taken the medication prescribed at the pain clinic, that the doctor there "cut him off" and that his hypertension was controlled with Cozaar and Lotrel.

Examination revealed a good neck range of motion, tender palpation along the cervical spine, and ability to heel and toe walk. PA Johnson instructed Woods that he "need[ed] to help himself a little bit. He need[ed] to get up and start moving around and not

just sit around doing nothing" and that his muscular pain was stiffness caused by not moving. PA Johnson instructed Woods to treat his neck and back pain with range of motion exercises, heat, ice, and stretching. She informed him she was "not going to continue with pain management" and that he could seek the care at another pain clinic. She prescribed Lortab;

83. A February 4, 2005 Psychological Evaluation from Tony R. Goudy, Ph.D., a psychologist, requested by Woods' attorney, indicating Woods reported he had "been suffering from chronic pain, depression, and anxiety." Woods reported that his depression manifested itself in anhedonia, weight fluctuation, disturbed sleep, poor energy, feelings of guilt and worthlessness, poor concentration, and crying spells. Woods stated his anxiety symptoms included chronic motor tension, tension headaches, muscle jerks, muscle spasms, autonomic hyperactivity, apprehensive expectations, and feelings of discomfort with being in public.

Woods further reported that he had "suffered from anxiety and depression for years and that "his symptoms have significantly interfered with his daily functioning since 2002." Woods also reported that he had not engaged in individual psychotherapy or been psychiatrically hospitalized, but had taken Paxil in 2002 as prescribed by his family physician but that he discontinued the

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

medication because "he felt . . . it did not help alleviate his
symptoms".

Dr. Goudy indicated that Woods' affect was restricted,
described his mood as reserved, his speech as relevant,
spontaneous, and coherent, he was well oriented as to time, place,
person, and circumstance, and his immediate and remote memories
were intact. Dr. Goudy opined that Woods had mild impairment to
his recent memory, had markedly impaired concentration, could
function in the average intellectual range and had intact judgment.

Dr. Goudy further indicated that Woods' score of 35 on the
Beck Depression Inventory II "reflect[ed] severe depressive
symptomology" and that his score of 24 on the Beck Anxiety
Inventory "reflect[ed] moderate levels of anxiety." Dr. Goudy
opined that Woods' "most severe symptom . . . include[d] numbness
or tingling, a general inability to relax, fear of the worst
happening, heart racing, general nervousness, and chronic
indigestion".

Dr. Goudy made the following diagnostic impressions: Axis I –
depressive disorder, not otherwise specified, and generalized
anxiety disorder; Axis IV – "financial problems, unemployment";
Axis V – current GAF 55-60. Dr. Goudy found, due to the
combination of his affective and anxiety-related disorders, Woods
experienced mild impairment to his activities of daily living; mild

to moderate impairment to social functioning; marked impairment to his concentration, persistence, and pace; and no episodes of decompensation. Dr. Goudy opined Woods did not meet a Listing and would benefit from psychotherapy, specifically stress and pain management;

84. A March 18, 2005 Medical Source Statement of Ability to Do Work-Related Activities (Mental) from Dr. Goudy indicting that Woods' had good ability to understand, remember and carry out instructions, remember locations and work-like procedures, understand and remember short, simple instructions, make simple work-related decisions, had fair ability to carry out short, simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, and sustain an ordinary routine without special supervision, had poor ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and work with or near others without being distracted by them, had excellent ability to respond appropriately to supervision, co-workers, and work pressures, ask simple questions or request assistance and adhere to basic standards of neatness and cleanliness, had good ability to accept instructions and respond appropriately to criticism from supervisors, get along with co-workers and peers, maintain socially appropriate behavior, travel in unfamiliar places

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

or use public transportation, and set realistic goals or make plans independently of others, and had fair ability to interact appropriately with the public, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions;

85.  A March 30, 2005 note from PA Johnson at Summersville Outpatient Center Family Practice indicating complaints of neck and low back pain and "problems with anxiety and some depression." Woods reported that he was no longer "able to go to the pain clinic because he had another injury", and that Dr. Loimil had treated him with anti-inflammatory medications, which have been recalled, such as Vioxx.  Woods requested a prescription for Lortab and Flexeril. He also informed PA Johnson that his wife had been prescribed Xanax by Dr. Olson, that he had taken some of her prescription and that it had provided "immediate relief so now he want[ed] to be put on [Xanax] as well".

PA Johnson reviewed Woods' MRI, which showed disc herniation at C5/C6 and minimal disc herniation at C5 and C6, T8/T9 and T9/T10 and stated that she "really [did not] understand or recognize any findings on [that] . . . MRI that would indicate him [sic] needing to have chronic pain medication."  PA Johnson informed Woods she did not "do back pain management"; however, she prescribed Lortab and Flexeril.  She discussed prescribing a selective serotonin

reuptake inhibitor or a serotonin norepinephrine reuptake inhibitor to treat his reported depression symptoms, but Woods stated that he "prefer[red] to be on the Xanax." PA Johnson prescribed Xanax;

86. An April 12, 2005 report from Dr. Olson at Summersville Memorial Hospital/Family Practice indicating Woods was a "complicated patient who had been seeing other providers" and who felt like nothing was "being done . . . to resolve" his neck and back pain, inability to sleep, loss of appetite, crying, general depression, and feelings of anxiety and nervousness. Woods requested a prescription for Xanax and informed Dr. Olson he had "tried some of his wife's" medication and it had "help[ed] him immeasurably." Dr. Olson prescribed Xanax "for a while only as long as he [kept] appointments with counseling/Seneca which he agree[d] to do";

87. A June 7, 2005, Psychological Screening from William D. Hagerty, M.S., a licensed psychologist, at Seneca Health Services Inc. indicating that Woods was fully oriented and had no symptoms of thought disturbances.

Woods reported that he slept six hours per night and that his sleep was periodically disrupted by "what may be panic attacks", that his appetite was "okay", that he did not have thoughts of harming himself or others, that he had felt depressed "on and off over the past year" due to "pain and financial worries."

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Hagerty diagnosed major depressive disorder, moderate, recurrent, and a GAF of 45. Mr. Hagerty recommended therapy and psychiatric services to "address his symptoms";

88. A June 8, 2005 Multiaxil Assessment from Cathy Edwards of Seneca Health Services indicating a diagnosis of major depression, recurrent, moderate, and a GAF of 45;

89. A June 15, 2005 report from Dr. Olson at Summersville Outpatient Center Family Practice indicating complaints of back pain, chronic anxiety, and depression. Dr. Olson noted Woods had been "terminated at the pain clinic because he shared his pills with his wife who didn't have enough and he failed his drug test." Woods requested a prescription for Lortab but Dr. Olson refused to prescribe that medication.

Examination revealed a limited range of motion of the neck, marked tenderness over the base of his cervical spine, no upper extremity weakness, no diminution in strength, no interosseous atrophy, bilaterally equal reflexes, straight spine, some mild paraspinous tenderness, and equal reflexes in his lower extremities. Dr. Olson diagnosed chronic lumbosacral pain and prescribed Tylenol 3, Xanax, and Robaxin and noted that he would attempt to get Woods accepted into the West Virginia University Pain Clinic for pain management and the Seneca Health Services for "evaluation and followup of depression and anxiety";

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

90.   A June 17, 2005 note from Seneca Health Services, Inc. indicating a prescription for Paxil;

91.   A July 21, 2005 note from Seneca Health Services, Inc. indicating prescriptions for Paxil and Tarazapan;

92.   An August 11, 2005 report from the Emergency Department of Summersville Memorial Hospital indicating complaints of back pain, treatment with Toradol and Solunedrol, prescriptions for Ultracet, Lodine, and Skelaxin, and a release to home in good condition;

93.   An August 16, 2005 Multiaxil Assessment from Cathy Edwards, Woods' case manager at Seneca Health Services, Inc. indicating a diagnosis of major depression, recurrent, moderate, and anxiety disorder, "NOS" and a GAF of 55;

94.   An August 26, 2005 report from Summersville Outpatient Center Family Practice for a follow-up examination of his neck and back indicating that Woods reported to Dr. Olson that Tylenol 3 did not alleviate his pain and a request for Tylenol 4. Woods also informed Dr. Olson that he occasionally took an "extra Xanax to rest" and that Dr. Urick had prescribed Restoril.  Dr. Olson found Woods' physical  condition unchanged and prescribed Tylenol 4 and Xanax.  He instructed Plaintiff to return in two months and to follow up with Dr. Urick;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

95.  An October 10, 2005, report from Dr. Olson indicating complaint of chronic back pain. Dr. Olson noted Woods' medications included Tylenol 4 and Xanax and Restoril prescribed by Dr. Urick. Dr. Olson noted Woods' physical condition was unchanged.  Dr. Olson continued the prescriptions for Tylenol 4 and Xanax and instructed Woods to return in two months;

96.  An October 17, 2005, note from Seneca Health Services, Inc. indicating prescriptions for Paxil and Tarazapan; and

97.  A December 2, 2005, Psychological Evaluation Update from Dr. Goudy at the request of Woods' attorney indicating Woods' depression symptoms were "similar to the ones noted in February" 2005 and that his anxiety symptoms appeared to "remain relatively unchanged" since February 2005.  Dr. Goudy noted the prescriptions for Paxil and Tomazepam by a psychiatrist at Seneca Health Services and Xanax by his primary care physician. Dr. Goudy also noted Woods had never undergone psychotherapy; however, Woods reported "his psychiatrist [was] providing psychotherapy during their monthly medication management appointments."

The Beck Depression Inventory II revealed a score of 55, which was significantly higher than the 35 he scored in February, 2005. Dr. Goudy found Woods' depression was "significantly worse" and noted his most severe symptoms "included sadness, pessimism, feeling like a failure, loss of pleasure, guilt, self criticalness,

agitation, loss of interest, difficulty making decisions, feelings of worthlessness, loss of energy, sleep disturbances, irritability, concentration problems, general fatigue, and decreased libido. Dr. Goudy stated the BDI-II results were "not surprising" because Woods had reported that Paxil did not "significantly reduce his depression," although his doctor continued to prescribe Paxil for his symptoms of depression.

Woods scored 23 on the Beck Anxiety Inventory and had scored 24 in February, 2005. Dr. Goudy opined the scores were "essentially consistent." Dr. Goudy noted Woods was taking two separate medications that were prescribed by two separate physicians to treat his anxiety, and those "medications [had] at least been able to keep his anxiety from worsening".

Dr. Goudy diagnosed major depressive disorder, recurrent and moderate, and generalized anxiety disorder with a GAF of 50-55. Dr. Goudy determined that, due to the combination of depression and anxiety symptoms, Woods' activities of daily living were mildly to moderately impaired, his social functioning was moderately impaired, his concentration, persistence, and pace were markedly impaired, and there were no episodes of decompensation.

Dr. Goudy found Woods did not meet a Listing.

## VI. DISCUSSION

## A. Residual Functional Capacity and Report from Physical Therapist

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Woods objects to the ALJ's residual functional capacity ("RFC") finding that he retains the ability to perform limited light work. Woods contends that the ALJ failed to properly consider the February 25, 2004 FCE report from Arthur Smith, Jr., a physical therapist at Gauley Bridge Physical Therapy and the medical reports and office notes of Dr. Luis Loimil.

The ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. He is unable to climb ropes, ladders or scaffolds. He can occasionally climb, balance, stoop, kneel, crouch and crawl. His ability to reach in all directions is limited by neck pain. He must avoid exposure to extreme cold. He must avoid even moderate exposure to heat, noise and hazards, including use of machinery. He can understand, remember and carry out simple instructions and tasks only. He is limited to positions that would allow for only limited contact with the public and coworkers. Also, he might require extra supervision to assure he would finish assigned tasks. In making this finding, the undersigned considered . . . opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p and 96-6p.

20 C.F.R. $ 416.913 provides:

> (a) . . . We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). . . . Acceptable medical sources are: (1) Licensed physicians (medical or osteopathic doctors);

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> (2) Licensed or certified psychologists. . . .
>
> (3) Licensed optometrists . . . .
>
> (4) Licensed podiatrists . . . .
>
> (5) Qualified speech-language pathologists . . . ."
>
> (d) Other sources.  In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we **may** also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work or, if you are a child, how you typically function compared to children your age who do not have impairments. Other sources include, but are not limited to –
>
> (1) Medical sources not listed in paragraph (a) of this section (for example, . . . therapists)  (emphasis added).

Thus, it is clear that pursuant to 20 C.F.R. $ 416.913 an  ALJ may consider evidence from a therapist but is not required to consider the opinion of a physical therapist.  Moreover, in <u>Lee v. Sullivan</u>, 945 F.2d 687, 691 (1991), the Fourth Circuit held that those other than "an 'acceptable medical source'" do "not qualify . . . to make a 'medical assessment' on a Social Security claimant's 'ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling'" and their  "assessment can qualify only as a layman's opinion."

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

In his February 25, 2004 Functional Capacity Evaluation, Arthur Smith, Jr., a physical therapist with Gauley River Physical Therapy & Rehabilitation, LLC, indicated Woods had moderate pain during the testing, had the ability to frequently leg lift twenty pounds, occasionally twelve-inch lift thirty pounds, occasionally shoulder lift ten pounds, frequently shoulder lift five pounds, occasionally carry fifteen pounds for thirty feet, frequently carry eight pounds for thirty feet, occasionally push twenty pounds for thirty feet, and occasionally pull twenty-five pounds for thirty feet. The report also indicated that Woods could occasionally sit, stand, squat, crawl, climb stairs, and use leg controls, could minimally bend and constantly stand and walk, could frequently walk, reach, and use arm controls and **could work at the sedentary light level**.

Smith also recognized two courses of action as "feasible" with regard to Woods' return to work. First, Woods could return to his cashier job part-time and increase to full-time over a three-to-four week period, or he could enter into a work conditioning program and progress to a work hardening program that would rehabilitate him for his job. Second, if an alternative work position was the goal, a determination should be made whether Woods could immediately begin work or should enroll in industrial rehabilitation to qualify for a new job.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

The ALJ relied on the opinions of the examining and treating physicians consistent with all of the objective evidence of record.

Review of the medical evidence of record establishes that the majority of physicians who examined Woods determined he was capable of returning to work at the light level:

1.    an October 9, 2002 report from Dr. Bachwitt indicating Woods could return to sedentary and light work;

2.    a February 21, 2003 report from Dr. Loimil indicating Woods could return to light duty work;

3.    a January 14, 2004 report from Dr. Fernandes indicting Woods could return to light duty work as a cash register attendant;

4.    a June 24, 2004 report from Dr. Snead indicating Woods could lift up to twenty to 25 pounds and could return to light duty work;

5.    an August 30, 2004 report from Dr. Loimil indicating Woods was released to light duty work;

6.    a May 24, 2004 opinion of the state agency physician indicating Woods could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk and for about six hours in an eight-hour workday, occasionally balance, stoop, kneel, crouch, crawl, climb, could never climb ropes, was limited in his reaching, had to avoid moderate exposure

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

to extreme heat, vibration, and hazards, and had to avoid concentrated exposure to extreme cold; and

7.    an October 6, 2004 opinion from Dr. Rafael that Woods retained the RFC to perform light work.

Accordingly, Magistrate Judge Kaull determined that the ALJ was not required to consider the report of physical therapist Smith and that both Smith and Dr. Loimil at various times during their treatment of Woods determined he retained the capability to perform work at the light level. Therefore, the magistrate judge concluded that the record contained sufficient evidence to support the ALJ's decision that Woods retained the residual functional capacity for light work. The Court agrees.

**B.    Credibility determination**

Woods also objects to the ALJ's assessment of his pain and other non-exertional limitations, and asserts that the ALJ incorrectly evaluated the medical evidence of record and incorrectly determined that his testimony was not entirely credible.

In <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)), the Fourth Circuit held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

claimant, the ALJ's observations concerning these questions are to be given great weight."

In <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996), the Fourth Circuit established a two-step process for determining whether a person is disabled by pain or other symptoms. <u>Craig</u> provides:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers.* The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> any other evidence relevant to the severity of
> the impairment, such as evidence of the
> claimant's daily activities, specific
> descriptions of the pain, and any medical
> treatment taken to alleviate it. *See* 20
> C.F.R. § 416.929(c)(3) & 404.1529(c)(3).
> (Emphasis added).

Craig, supra at 594.

Here, Magistrate Judge Kaull determined that the ALJ fully
complied with the first prong in Craig, when he found that Woods
had "produced evidence of impairments that could reasonably be
expected to cause the type of pain he alleges . . . ." The ALJ
then proceeded to the second prong of Craig that requires review
and evaluation of

> not only the claimant's statements about [his]
> pain, but also 'all the available evidence,'
> including the claimant's medical history,
> medical signs, and laboratory findings, . . .
> any objective medical evidence of pain . . .
> and any other evidence relevant to the
> severity of the impairment, such as evidence
> of the claimant's daily activities, specific
> descriptions of the pain, and any medical
> treatment taken to alleviate it.

The record clearly demonstrates that the ALJ considered all of
the second-step factors set forth in Craig regarding Woods'
allegations of pain and depression. For example, the ALJ discussed
Woods' medical history, his medical signs, laboratory findings,
objective evidence of pain, daily activities, the medical treatment
he took to alleviate the pain, and his statements about his pain

46

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

and limitations.  The ALJ's analysis also considered all of the
medical evidence of record, including 1) the December 21, 1999,
lumbar spine MRI that indicated a disk space narrowing at L5-S1,
posterior osteophytes at L5-S1 and generalized bulging without
herniation at L4-5 and L5-S1; 2) the March 9, 2002 x-ray that
showed severe degenerative changes at L5-S1 with marked narrowing
and vacuum phenomena, hypertorphic changes of L4 and L5 and no
abnormal translation on flexion and extension; 3) the April 13,
2002, lumbar spine MRI that showed only mild degenerative changes
at L4-5 and L5-S1; 4) the July 31, 2003, thoracic x-ray that showed
only some spondylosis and July 31, 2003 lumbar spine x-ray that
revealed prominent degenerative disc disease at L5-S1, facet
arthrosis and hypertrophy with spurring/arthritic degenerative
changes; 5) the August 13, 2003, cervical spine MRI that showed C5-
6 disc herniation; and 6) the August 13, 2003 thoracic spine MRI
that showed left-sided bony hypertorphy and "perhaps" minimal disc
bulges.

The ALJ also considered and evaluated all of the objective
medical opinions and diagnoses in the record. The ALJ specifically
noted review of: 1) Dr. Ranavaya's June 12, 2000 opinion that Woods
could return to light work; 2) the conservative medical treatment
Woods received in 2000 for his lumbar back pain; 3) Dr. Loimil's
March 9, 2002 diagnosis that Woods had a lumbosacral strain

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

superimposed on arthrosis; 4) Dr. Bachwitt's October 9, 2002 opinion that Woods could perform sedentary to light work; 5) Dr. Loimil's February 21, 2003 opinion that Woods could perform light work; 6) the September 11, 2003 opinion from Dr. Amores recommending conservative treatment for his cervical and thoracic pain; 7) the January 14, 2004 opinion from Dr. Fernandes of post lumbosacral strain, degenerative disc disease at L4-5 and L5-S1, chronic low back pain syndrome and history of whiplash injury with retained ability to perform light work; 8) the June 24, 2004, opinion of Dr. Snead that Woods could return to light work; 9) Dr. Loimil's release of Woods for light work on August 30, 2004; 10) the March 30, 2005 opinion of Physician's Assistant Johnson that she did not "really understand or recognize any findings on [Plaintiff's] last MRI that would indicate [Plaintiff] need[ed] to have chronic pain medication"; 11) Dr. Olson's June 15, 2005 diagnosis of chronic lumbosacral pain; and 12) an August 11, 2005 diagnosis at an emergency room of chronic low back pain.

Furthermore, the ALJ discussed the fact that Woods repeatedly sought and was prescribed medication for treatment of his pain. The ALJ noted that Woods' pain was treated conservatively with medication and a TENS unit, and that Woods did not have any surgery or steroid epidural injections. Significantly, the ALJ noted that Woods was "instructed to get up and start moving around and not

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

just sit around doing nothing" because his "pain was reported to be
in places that [were] muscular".

Moreover, the ALJ acknowledged that Woods received physical
therapy. The ALJ noted that Woods reported on October 22, 2003,
that his pain was "help[ed] a lot" by physical therapy" and was
"rated down to . . . a three and four . . . without radiation." It
is significant that the one hour physical therapy resulted in no
significant problems and an improved range of motion and that it
was discontinued on December 22, 2003 due to Woods' "poor
compliance/motivation".

The ALJ also considered Woods' activities of daily living.
The ALJ noted that Woods reported that he did not leave the house
often, did not perform any yard work, dressed himself slowly, did
not perform housework, went to the grocery store with his wife,
slept four to five hours per night, read the newspaper, watched
television most of the day, listened to the radio, and drove his
children to school.

With regard to the ALJ's analysis of Woods' depression, Woods
contends that the ALJ did not "give any credible reasons for
finding that he lacked credibility as to the . . . limitations
caused by his depression". Woods relies specifically on the "severe
mental impairments diagnosed in psychologist Goudy's two evaluation

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

reports that he feels substantiate his complaints of concentration and memory problems, persistence and pace . . . ."

In evaluating Woods' allegations of depression, the ALJ considered and weighed:

1.   the December 23, 2003 report from Mr. Spaulding indicating Woods' mood was solemn, his affect was constricted, his delayed memory was mildly restricted, an otherwise normal examination and a diagnosis of general anxiety disorder and mood disorder, not other wise specified;

2.   the February 4, 2005 findings of Dr. Goudy, who diagnosed generalized anxiety accompanied by motor tension, autonomic hyperactivity and apprehensive expectation, with mild restriction of activities of daily living, mild impairment of social functioning, marked impairment of ability to maintain concentration, persistence, or pace but further note that Woods did not meet the criteria for a listing;

3.   the June 7, 2005 findings of Mr. Hagerty, who diagnosed major depressive disorder, moderate, recurrent; and

4.   the December 2, 2005 findings of Dr. Goudy indicating mild to moderate impairment of activities of daily living, moderate limitation to social functioning, marked impairment in ability to maintain concentration, persistence or pace that still did not meet the criteria for a listing.

ORDER ADOPTING MAGISTRATE JUDGE'S<br>REPORT AND RECOMMENDATION

The ALJ assessed the medical treatment Woods received for depression and noted a prescription for Paxil on February 8, 2002, and a prescription for Xanax on March 30, 2005 after a specific request from Woods for that medication. The ALJ noted that Woods "had taken some of his wife's Xanax and had immediate relief of his anxiety and depression."

The ALJ noted that: the "record indicate[d] the claimant has no difficulty relating with family members or friends"; that "[t]reatment notes throughout the record indicate[d] normal social functioning"; that during the administrative hearing Woods behaved "in a socially appropriate manner throughout the hearing." The ALJ further noted that Woods' testimony that he had difficulty concentrating on television shows was inconsistent with his observation of Woods' ability to "maintain adequate attention and concentration at the hearing in order to answer questions without significant difficulty" and was not supported by the evidence of record which showed concentration within normal limits.

In his credibility analysis, the ALJ noted:

> There are several inconsistencies in the record. Although the claimant alleges severe pain, the record indicates that on October 22, 2003, he reported physical therapy was helping a lot and that his pain was rated down to between a three and four out of ten. On February 9, 2004, the claimant reported his pain was at a level two or three with medications. On April 2, 2004, the claimant

51

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

> reported his pain was a level two out of ten
> with medication (Exhibit 23F). . . . Although
> the claimant has indicted inability to return
> to work, his treating source reported he was
> not told to stay off work.  He was given an
> excuse from work only through September 15,
> 2003.  Furthermore, the physical therapy [sic]
> reported on December 15, 2003, that the
> claimant had been working out for an hour each
> time and really was not having any significant
> problems during the period of time (Exhibit
> 29F).

Therefore, the magistrate judge determined that in making his determination regarding Woods' complaints of pain and limitations caused by depression, the ALJ had properly considered the objective medical evidence of record, the evidence of daily activities, the descriptions of limitations, the evidence of medical treatment to alleviate limitations, and the inconsistencies in Woods' statements. Accordingly, the magistrate judge determined that the record contains substantial evidence to support the ALJ's credibility finding regarding Woods' allegations of pain and depression. This Court agrees.

## C.  Hypothetical to VE

Next, Woods contends that the ALJ erroneously concluded that he could perform "other work" which existed in significant numbers in the national economy. Specifically, Woods alleges that, in his hypothetical question to the VE, the ALJ failed to consider the

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

limitations contained in the FCE report of physical therapist Smith and the psychological report of Dr. Goudy.

At the  fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1) required the ALJ to consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work."

20 C.F.R. §§ 404.1566(e), 416.966(e) provides that, in making his determination, the ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. In Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989), the Fourth Circuit held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform."  In English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)), the Fourth Circuit held that, when "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to

the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment."

In <u>Edwards v. Bowen</u>, 672 F. Supp. 230, 235 (E.D.N.C. 1987), the court held that "if the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner." Also, in <u>English v. Shalala</u>, 10 F.3d 1080, 1085 (4th Cir. 1993), the Fourth Circuit held that the reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges."

Here, the ALJ posed the following hypothetical to the VE:

> . . . He would be unable to climb a rope, ladder or scaffold. He would be limited to occasional climbing, balancing. Climbing would be stairs and ramps for the occasional, also occasional balancing, stooping, kneeling, crouching and crawling. His ability to reach in all directions is limited by neck pain. He should avoid concentrated exposures to extreme cold. He should avoid moderate exposure to extreme heat, noise and hazards, including use of machinery. In addition he would be limited to understanding, remembering and carrying out simple instructions or tasks only. He would be limited to positions that would allow for only limited contact with the public and co-workers. And he might require extra supervision to ensure that he finished assigned tasks.

Woods asserts that this hypothetical is incomplete because the ALJ failed to include the limitations found by Physical Therapist

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Smith and Dr. Goudy.  Specifically, Woods contends that, when his attorney presented the vocational witness with a hypothetical consistent with the residual functional capacity assessment performed by Gauley River Physical Therapy, the VE concluded that he would be unable to perform substantial gainful employment. Counsel asked if the jobs listed by the VE would be available to a person who could not sit or stand more than one-third of a day, could not frequently lift more than five pounds at shoulder level more than one-third of a day, or could not perform any other kind of lifting other than occasional lifting for one-third of the day. The VE's response to this hypothetical was that there would be no jobs.

As noted above, the ALJ was not required to consider the evidence offered by a physical therapist in determining the ability to do work because a physical therapist is not an acceptable medical source. <u>See</u> 20 C.F.R. §416.913(a)(d). <u>See</u> <u>also</u> 20 CFR 404.1513(d)(1); 404.1527(a)(2); 416.927(a)(2). Moreover, the ALJ reviewed all of the objective medical evidence in the record and determined that the physical therapist's opinion was not consistent with the opinions of the licensed physicians. Therefore, the magistrate judge determined that the record contained substantial evidence to support the ALJ's decision to omit the findings of physical therapist Smith from the hypothetical.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Woods also asserts that the ALJ's hypothetical was incomplete because it did not "fairly set out all the claimant's impairments," specifically those found by Dr. Goudy.  Woods argues that,

> [w]hen asked to assume the mental impairments
> determined by Psychologist Goudy in two test-
> assisted evaluations conducted a year apart
> revealing inability to maintain attention and
> concentration for extended periods or
> inability to perform at a consistence [sic]
> pace or being unable, at least for part of a
> day, to carry out simple instructions, or
> unable to perform activities within a
> schedule, maintain regular attendance and be
> punctual, the witness [the VE] stated that he
> [the Plaintiff] would be unable to work.

On March 18, 2005, Dr. Goudy indicated that Woods' ability to carry out simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual was "fair".  The December 2005 opinion reflected that Dr. Goudy had not changed the evaluation.  Importantly, Dr. Goudy opined in his report that Woods failed to meet the criteria of a Listing.

After reviewing all of the medical evidence of record, the ALJ determined that "Dr. Goudy's opinions are . . . not well-supported or adequately explained.  They are inconsistent with Dr. Goudy's own evaluation, including the Global Assessment of Functioning scores."  Specifically, the ALJ noted that, on March 18, 2005, Dr. Goudy found that Woods' had "good" ability to remember locations and work-like procedures, understand and remember short, simple

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

instructions, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers, maintain socially appropriate behavior, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.

The ALJ further noted that, on March 18, 2005 Dr. Goudy found that Woods had a "fair" ability to carry out short, simple instructions, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, interact appropriately with the public, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions. Furthermore, on March 18, 2005 Dr. Goudy indicated that Woods had a "poor" ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, complete a normal workday or workweek, and perform at a consistent pace. Dr. Goudy noted that Woods' GAF was 55-60.

The ALJ noted that, in the December 2, 2005, evaluation, Dr. Goudy's only changes were that Woods' ability to interact appropriately with the public had changed from "fair" to "poor" and

his GAF was listed as 50-55. Significantly, the ALJ noted that even though the findings in the two reports remained virtually unchanged and Woods' GAF was stable, Dr. Goudy failed to "adequately explain" his December 2, 2005, opinion that Woods' "depression [was] significantly worse" than it was in March of that year and offered no additional support for his opinion.

The ALJ also noted that Woods had mild limitations in his activities of daily living, moderate limitations in his ability to maintain social functioning, moderate limitations in "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," and moderate limitation in his "ability to sustain focused attention sufficiently long [enough] to permit timely completion of tasks commonly found in work setting". The ALJ based his finding on the opinion of Mr. Spaulding that, except for mildly deficient delayed memory, Woods' psychological evaluation was within normal limits and Woods' March 30, 2005, statement that he requested and received a prescription for Xanax, after he reported that he had taken "some of his wife's Xanax and had immediate relief of his anxiety and depression".

Significantly, the ALJ observed Woods during the administrative hearing and noted that Woods maintained adequate attention and concentration during the hearing and was able to answer questions without significant difficulty.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Therefore, after reviewing all the medical evidence of record, Woods' own testimony, and observing Woods during the administrative hearing, the ALJ determined that the hypothetical posed to the VE included all of the mental limitations substantially supported by the evidence. Accordingly, the magistrate judge concluded that the record contained substantial evidence to support the ALJ's hypothetical and that "other work" existed in significant numbers in the national and local economy that Woods was capable of performing.  The Court agrees.

## VII. <u>CONCLUSION</u>

After careful examination of Woods' objections, the Court concludes that he has not raised any issues that were not thoroughly considered by Magistrate Judge Kaull in his Report and Recommendation. Moreover, upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances before the court in this action. Therefore, the Court **ORDERS** that Magistrate Judge Kaull's Report and Recommendation be accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate.  Accordingly, the Court

1.  **GRANTS** the defendant's motion for Summary Judgment (Docket No.  18);

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

2.    **DENIES** the plaintiff's motion for Summary Judgment or in
      the alternative for remand (Docket No. 16); and

3.    **DISMISSES WITH PREJUDICE** this civil action and directs
      the Clerk to retire it from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment
order. Fed.R.Civ.P. 58.

The Clerk of the Court is directed to transmit copies of this
Order to counsel of record.

DATED: September 27, 2007.


                                   /s/ Irene M. Keeley
                                   IRENE M. KEELEY
                                   UNITED STATES DISTRICT JUDGE